

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. ROBERT MILLER, | ) ) ) | **F I L E D** ~~Jun 11, 2008~~ **JUN 1 1 2008  EA** |
| Petitioner, | ) ) | |
| vs. | ) ) | MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT |
| | ) | No. 08 C 0023 |
| GREGORY SIMS, Warden, | ) ) | The Honorable |
| Respondent. | ) ) ) | Wayne R. Andersen, Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the following below-named exhibits are being filed with respondent's Motion to Dismiss the above-captioned petition for writ of habeas corpus:

**Exhibit A:**  Brief and argument for defendant-appellant in *People v. Miller*, No. 1-02-0504;

**Exhibit B:**  Brief and argument for plaintiff-appellee in *People v. Miller*, No. 1-02-0504;

**Exhibit C:**  Reply brief and argument for defendant-appellant in *People v. Miller*, No. 1-02-0504;

**Exhibit D:**  Rule 23 order in *People v. Miller*, No. 1-02-0504 (Ill. App. Dec. 8, 2003);

**Exhibit E:**  PLA in *People v. Miller*, No. 98200;

**Exhibit F:** Order denying PLA in *People v. Miller*, No. 98200, 813 N.E.2d 226 (Table) (Ill. 2004);

**Exhibit G:** Order dismissing petition for post-conviction relief in *People v. Miller*, No. 00 C 220576 (Cook Cty. Cir. Ct. Jan. 24, 2005);

**Exhibit H:** Brief and argument for petitioner-appellant in *People v. Miller*, No. 1-05-0585;

**Exhibit I:** Brief and argument for plaintiff-appellee in *People v. Miller*, No. 1-05-0585;

**Exhibit J:** Reply brief and argument for petitioner-appellant in *People v. Miller*, No. 1-05-0585;

**Exhibit K:** Rule 23 order in *People v. Miller*, No. 1-05-0585 (Ill. App. Aug. 6, 2007);

**Exhibit L:** PLA in *People v. Miller*, No. 105194; and

**Exhibit M:** Order denying PLA in *People v. Miller,* No. 105194, 879 N.E.2d 936 (Table) (Ill. 2007).

June 11, 2008

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:

GARSON FISCHER, Bar # 6286165
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
TELEPHONE: (312) 814-2566
FAX: (312) 814-2253
E-MAIL: gfischer@atg.state.il.us

No. 1-02-0504

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

RECEIVE
ORIGINAL APPEA

APR 2 9 200

RICHARD J. DALEY C
RICHARD A. DEVINE

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 C2 20576. |
| | ) | |
| ROBERT MILLER, | ) | Honorable |
| | ) | Marcia B. Orr, |
| Defendant-Appellant. | ) | Judge Presiding. |

---

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

---

MICHAEL J. PELLETIER
Deputy Defender

KARI K. FIREBAUGH
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

EXHIBIT A

## POINTS AND AUTHORITIES          Page

I.     **Because the Identification of Mr. Miller was Vague and Doubtful, the State Failed to Prove Mr. Miller's Guilt of Residential Burglary and Possession of Burglary Tools Beyond a Reasonable Doubt**.......................................................................................13

Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)...............13

People v. Ash, 102 Ill. 2d 485, 468 N.E.2d 1153 (1984)....:......................................13,14

In Re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)...................13,14

People v. Cullotta, 32 Ill. 2d 502, 207 N.E.2d 444 (1965)............................................14

Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).........................14

People v. Slim, 127 Ill. 2d 302, 537 N.E.2d 317 (1989)................................................14

Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2242, 53 L. Ed. 2d 140 (1977).........14,18

People v. Hernandez, 312 Ill. App. 3d 1032, 729 N.E.2d 65 (1st Dist. 2000)...........15,16

People v. Carroll, 12 Ill. App. 3d 869, 299 N.E.2d 134 (1973).................................17,18

People v. Blumenshine, 42 Ill. 2d 508, 250 N.E.2d 152 (1969)....................................17

Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967)..................18

People v. Wright, 126 Ill. App. 2d 91, 261 N.E.2d 445 (1st Dist. 1970).........................18

People v. Lee, 44 Ill. 2d 161, 254 N.E.2d 469 (1969).....................................................18

II.     **The Trial Court Erred When it Denied Mr. Miller's Motion For a New Trial, Because Miller's Trial Counsel Provided Ineffective Assistance When He Failed to Make a Motion to Suppress the Identification Evidence**...........................................21

People v. Abdullah, 2002 Ill. App. LEXIS 1177, *17 (4th Dist. 2002)...........................21

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,

80 L. Ed. 2d 674 (1984)..........................................................................................21,22

People v. Follins, 196 Ill. App. 3d 680, 554 N.E.2d 345 (1st Dist. 1990)......................22

People v. Brinson, 80 Ill. App. 3d 388, 399 N.E.2d 1010 (2nd Dist. 1980)....................22

People v. Stewart, 217 Ill. App. 3d 373, 577 N.E.2d 175 (3rd Dist. 1991)......................22

People v. Fernandez, 162 Ill. App. 3d 981, 516 N.E.2d 366 (1st Dist. 1987).................22

Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)..........................23

Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243,

53 L. Ed. 2d 140 (1977)...............................................................................23,25,28,29

People v. Carroll, 12 Ill. App. 3d 869, 299 N.E.2d 134 (1973)...........................24,25,28

People v. Blumenshine, 42 Ill. 2d 508, 250 N.E.2d 152 (1969)....................................24

People v. Wright, 126 Ill. App. 2d 91, 261 N.E.2d 445 (1st Dist. 1970)...................25,28

People v. Lee, 44 Ill. 2d 161, 254 N.E.2d 469 (1969)...............................................25,28

People v. Goodman, 109 Ill. App. 3d 203, 440 N.E.2d 345 (1st Dist. 1992).................25

People v. Hernandez, 312 Ill. App. 3d 1032, 729 N.E.2d 65 (1st Dist. 2000)............26,27

III.    **The Mandatory Class X Sentencing Provision of 730 ILCS 5/5-5-3(c)(8) Violates the Right of a Defendant to Due Process and Trial by Jury Because it Subjects the Defendant to Increased Punishment Without Notice or a Jury Finding Upon Proof Beyond a Reasonable Doubt of the Facts Qualifying the Defendant For Sentencing as a Class X Offender**.........................................................................................32

720 ILCS 5/19-3 (West 2002)......................................................................................32

730 ILCS 5/5-8-1(a)(4) (West 2002)...........................................................................32,36

730 ILCS 5/5-5-3(c)(8) (West 2002)......................................................................32-33,35-36

730 ILCS 5/5-8-1(a)(3) (West 2002)..........................................................................32,36

Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348,

147 L. Ed. 2d 435 (2000)......................................................................................32-36

People v. Jameson, 162 Ill. 2d 282, 642 N.E.2d 1207 (1994)..........................................33

People v. Williams, 149 Ill. 2d 467, 599 N.E.2d 913 (1992)....................................33,36

People v. Wallace, _Ill. App. 3d _, _N.E.2d_ (1st Dist. 2002)

(No. 1-00-0311, January 18, 2002)................................................................................33

People v. Dunn, _Ill. App. 3d_, _N.E.2d_ (1st Dist. 2001)

(No. 1-99-3304, November 8, 2001)..............................................................................33

People v. Echols, 325 Ill. App. 3d 515, 758 N.E.2d 878 (1st Dist. 2001)........................33

People v. Ramos, 318 Ill. App. 3d 181, 742 N.E.2d 763 (1st Dist. 2000)........................33

People v. Lathon, 317 Ill. App. 3d 573, 740 N.E.2d 377 (1st Dist. 2000)........................33

People v. Roberts, 318 Ill. App. 3d 719, 743 N.E.2d 1025 (1st Dist. 2000)......................33

People v. Fisher, 184 Ill. 2d 441, 705 N.E.2d 67 (1998)....................................................33

Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219,

140 L. Ed. 2d 350 (1998).......................................................................................34,35-36

People v. Childress, 321 Ill. App. 3d 13, 746 N.E.2d 783 (1st Dist. 2001)......................36

People v. Wagener, 196 Ill. 2d 269, 752 N.E.2d 430 (2001)...........................................37

People v. Zeisler, 125 Ill. 2d 42, 531 N.E.2d 24 (1988)....................................................37

People v. Arna, 168 Ill. 2d 107, 658 N.E.2d 445 (1995)....................................................37

People v. Clifton, 321 Ill. App. 3d 707, 750 N.E.2d 686 (1st Dist. 2001)........................37

IV.    **This Case Should be Remanded for the Trial Court to Properly Admonish Mr.**
       **Miller Pursuant to Supreme Court Rule 605(a), Because the Court Failed to Advise**
       **Mr. Miller of His Right to File a Written Motion to Reconsider Sentence, and That**
       **This Motion was Necessary to Preserve Issues for Appellate Review**.......................38

       S. Ct. R. 605(a)(3)(B) (West 2002)...............................................................................38

       S. Ct. R. 605(a)(3)(C) (West 2002)...............................................................................38

       People v. Mazar, 333 Ill. App. 3d 244, 755 N.E.2d 135 (1st Dist. 2002)...................38,39

       People v. Smith, 191 Ill. 2d 408, 732 N.E.2d 513 (2000).................................................39

V.     **The Mittimus Must be Amended to Reflect a Total of 503 Days of Credit Against the**
       **Sentence Where Mr. Miller's Credit was Erroneously Computed as 502 Days**.......40

       730 ILCS 5/5-8-7(b) (2000).........................................................................................40

       Moore v. Strayhorn, 114 Ill. 2d 538, 502 N.E.2d 727 (1986)..........................................40

       People v. Donnelly, 226 Ill. App. 3d 771, 589 N.E.2d 975 (4th Dist. 1992)...............40,41

       People v. Miles, 117 Ill. App. 3d 257, 453 N.E.2d 68 (4th Dist. 1983).............................40

       People v. Dieu, 298 Ill. App. 3d 245, 698 N.E.2d 663 (1998)........................................40

       People v. Woodard, 175 Ill. 2d 435, 677 N.E.2d 935 (1997)...........................................40

       People v. Saunders, 288 Ill. App. 3d 523, 680 N.E.2d 790 (4th Dist. 1997)....................40

## NATURE OF THE CASE

Robert Miller was convicted of residential burglary and possession of burglary tools after a bench trial and was sentenced to eighteen years in prison.

This is a direct appeal from the judgment of the court below. An issue is raised challenging the charging instrument, specifically, whether it gave Mr. Miller notice of the State's intention to sentence him as a Class X offender.

## ISSUES PRESENTED FOR REVIEW

1.   Because the Identification of Mr. Miller was Vague, Doubtful, and Uncertain, the State Failed to Prove Mr. Miller's Guilt of Residential Burglary and Possession of Burglary Tools Beyond a Reasonable Doubt.

2.   Whether the Trial Court Erred When it Denied Mr. Miller's Motion for a New Trial, Because Miller's Trial Counsel Provided Ineffective Assistance When He Failed to Make a Motion to Suppress the Identification Evidence.

3.   Whether the Mandatory Class X Sentencing Provision 730 ILCS 5/5-5-3(c)(8) Violates the Right of a Defendant to Due Process and Trial by Jury Because it Subjects the Defendant to Increased Punishment Without Notice or a Jury Finding Upon Proof Beyond a Reasonable Doubt of the Facts Qualifying the Defendant for Sentencing as a Class X Offender.

4.   Whether This Case Should be Remanded for the Trial Court to Properly Admonish Mr. Miller Pursuant to Supreme Court Rule 605(a), Because the Court Failed to Advise Mr. Miller of His Right to File a Written Motion to Reconsider Sentence, and That This Motion was Necessary to Preserve Issues for Appellate Review.

5.   Whether the Mittimus Must be Amended to Reflect a Total of 503 Days of Credit Against the Sentence Where Mr. Miller's Credit Was Erroneously Computed as 502 Days.

## JURISDICTION

Robert Miller appeals from a final judgment of conviction in a criminal case. He was sentenced on February 22, 2002. (R-249). Notice of appeal was timely filed on February 22, 2002. (C-166). Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

At the conclusion of a bench trial, Mr. Miller was convicted of residential burglary and possession of burglary tools. (R-171). The court sentenced Mr. Miller to eighteen years imprisonment. (R-249).

Mrs. Alexander testified that on October 8, 2000 at 5:30 p.m., she looked out of her bedroom window and observed that someone was in the enclosed back porch of her next door neighbor's house. (R-13-16,41). Mrs. Alexander and her husband were cat sitting for the neighbors while they were out of town, and they had the key to the neighbor's back porch. (R-14-15). Mrs. Alexander stated that she and her husband went next door, used the key to unlock the door to the porch, and noticed that one of the screens was cut and the window was open. (R-17-18). Mrs. Alexander testified that the hole in the screen was four feet by three feet, and both Mr. and Mrs. Alexander stated that the cut was large enough for a person to fit through. (R-18,51). The door leading from the back porch into the house was open. (R-18-19,52). Mrs. Alexander stated that the door was open and unlocked the last time she had been over to check on the neighbor's house. (R-19).

Mrs. Alexander testified that she shouted "hello," and received no response. (R-19). Mrs. Alexander then shouted "I'm calling the police now." (R-20). At this time, Mr. Alexander had left the neighbor's porch, and was headed back towards his house. (R-52). Mrs. Alexander testified that she backed out of the porch, and began closing the back door when she heard screaming and saw a man running towards her waiving his hands. (R-20,32-33). Mrs. Alexander later identified this man as Mr. Miller. (R-21-22). Mrs. Alexander was frightened, tripped on the

back porch steps, and fell to the ground. (R-20,32-33). Mr. Alexander testified that when he heard screaming and the sound of a door slamming, he turned around. (R-53). Mr. Alexander, who was fifteen to twenty feet away, saw both his wife falling and a man standing on the back porch steps. (R-62-63). Mr. Alexander identified Mr. Miller as the man he saw on the back porch steps. (R-58-59). Mr. Alexander testified that he was frightened and could see Miller's face. (R-54,63).

Mrs. Alexander testified that while she was lying on the ground, Mr. Miller ran past her to get to his bike, which she described as dark. (R-33,44). The bike was on the same side of the house as the open window and cut screen. (R-22-23). Mr. Miller was two feet away from Mrs. Alexander when he ran by, and she saw his face at this time. (R-21,24-25). Mr. Alexander testified that Mr. Miller, who was still screaming, walked down the back porch steps, and walked to the side of the house to get to his bike, which Mr. Alexander described as blue. (R-53,64-65). Only a few seconds passed from the time Mr. Miller appeared on the back porch steps to the time he got to his bike. (R-34).

Mr. Alexander testified that he followed Mr. Miller when Miller began walking the bike towards the gate in between the two houses. (R-55-56). Mr. Alexander was six to eight feet away from Mr. Miller during this time. (R-55). Mr. Alexander testified that when Mr. Miller reached the gate, the bike got stuck and Miller began pulling it towards him while he backed through the gate. (R-56-57). Mr. Alexander and Mr. Miller were the bike's length apart, Miller was facing Mr. Alexander, and Mr. Alexander could see his face. (R-56-57). Mr. Alexander testified that he jumped towards Mr. Miller and hit the bike, which caused both him and Miller to fall to the ground. (R-57). While on the ground, Mr. Alexander was facing Mr. Miller. (R-57). Mrs.

Alexander testified that while she was lying on the ground four to five feet away, she observed her husband struggling with Mr. Miller over the bike, and could see Miller's face. (R-23-25). The struggle between Mr. Alexander and Mr. Miller took a few seconds. (R-34).

Both Mr. and Mrs. Alexander testified that at the time the incident occurred, it was still light outside. (R-16,49). At trial, Mrs. Alexander testified that the man who ran out of her neighbor's house was in his forties, and wearing dark clothes and a dark knit stocking or skull hat. (R-22,25). Mr. Alexander, who is six feet tall, testified that the man was much shorter than him and in his late thirties. (R-54). Mr. Alexander described the clothing the man was wearing as a black coat, and jeans that were black in nature although he did not know the exact color, as well as a wool stocking cap that was worn down over the man's forehead. (R-54,63-64). Both Mr. and Mrs. Alexander testified that they had never seen the man before. (R-34,63).

Mrs. Alexander testified that Miller left on foot going South on Sherman. (R-24). Mr. Alexander testified that Miller left on foot going South on Sherman, and he observed Miller turn West onto Garfield. (R-58-59). Both Mr. and Mrs. Alexander testified that Mr. Miller left his bike and hat behind. (R-24,58-59). Mrs. Alexander went inside the neighbor's house and called the police, and Officer Firth came to the house ten to fifteen minutes later. (R-41,25,36). Mrs. Alexander testified that ten to fifteen minutes after Firth arrived at the house, a second squad car brought a man to the house. (R-42,25-26).

Mary Conlon testified that she lives at 2205 Sherman, and was out of town on October 8, 2000. (R-74). When she returned home from her trip, Ms. Conlon observed that the drawers had been pulled out of the cabinet in her bedroom, and the items in the drawers had been scattered throughout her bedroom and the hallway. (R-75). Conlon stated that she observed a duffel bag at

the top of the steps, which contained some of the contents of the cabinet drawers. (R-77-79). All of the items in the duffel bag, had either been in the cabinet drawers or on the cabinet when she left for her trip. (R-78-79). Conlon testified that she did not know Mr. Miller, and never gave him permission to enter her house or take anything from it. (R-75). Conlon stated that nothing was taken from her home. (R-78).

On October 8, 2000 Officer Lambeseder was on patrol, alone, in uniform, and in a marked squad car. (R-80-81). At around 5:35 or 5:40 p.m., Lambeseder heard a radio message that there was a burglary in progress around the 2100-2200 block of Sherman. (R-80-81,88). The message stated that the offender was last seen going West on Sherman, and described the offender as male, black, short, and wearing dark clothing. (R-81). Lambeseder drove towards the area where he thought the offender might be running. (R-81). As he was driving, Lambeseder heard a second radio message, this one from Officer Devoy, who stated that he observed a man that matched the description of the offender running West around Maple. (R-81-82). Lambeseder testified that Maple is parallel to Sherman, and it is the first north-south street to its west. (R-82). The next street after Maple in that direction is Ridge. (R-82).

Lambeseder drove to the 2100 block of Ridge at Leonard and parked on the west side of the street facing east. (R-82-83). Lambaseder testified that less than ten minutes later, he observed a man who was short, black, and wearing dark clothing, sprint in between some houses towards Ridge. (R-83). In Lambeseder's supplemental report, he noted that the man was running west through some yards. (R-119-121). Lambeseder identified this man as the defendant, Mr. Miller. (R-86).

After looking at photographs marked defense exhibit one through five, Lambeseder stated

-7-

that the buildings he observed Mr. Miller running from were not all houses, but one was a larger

building. (R-89-90). Lambaseder testified that from where he was sitting that day, he could not

have seen through to the yards of those buildings or in between those buildings. (R-90-91).

Lambeseder stated that he observed Mr. Miller running from the time Miller exited out from in

between the buildings to the time he reached Ridge, which was a distance of twenty feet. (R-90-

92). Lambeseder testified that as Mr. Miller approached the east side of Ridge, Miller looked in

his direction, stopped running, and began to walk. (R-84-85). Lambeseder observed no one else

running or matching the description of the offender in the area during that time. (R-85-86).

Lambeseder testified that when he stopped Mr.Miller, he observed that Miller was out of

breath and sweaty. (R-85). Lambaseder did not include this observation in his supplemental

police report. (R-119-120). Lambeseder asked Miller to place his hands on the squad car, and

handcuffed him. (R-86). Lambeseder told Miller that he was being stopped for burglary because

he fit the description of the offender. (R-86). Lambeseder searched Mr. Miller, and found a small

pry bar in his front pocket, and two Swiss army knives in his rear right pocket. (R-86-87).

Lambaseder testified that none of the items recovered from Mr. Miller were the proceeds of the

burglary. (R-93-94). Lambeseder stated that Mr. Miller never attempted to run from him, and

complied with all of his commands. (R-92).

While Lambeseder had Mr. Miller stopped at Leonard and Ridge, Officers Firth, Santillo,

and Devoy showed up. (R-96-97). Firth went to 2205 Sherman to talk to the witnesses, while

Lambeseder kept Miller at Leonard and Ridge. (R-99). Officer Firth testified that when he went

onto the back porch at 2205 Sherman, he observed pry marks on the window frame. (R-107).

Five to ten minutes later, Firth contacted Lambeseder and told him to bring Miller to 2205

-8-

Sherman. (R-98-99). Mr. Miller was put into Lambaseder's marked squad car and taken to 2205 Sherman for a showup. (R-87-88).

At 2205 Sherman, Lambeseder had Mr. Miller get out of the squad car and stand on the curb near the sidewalk. (R-100-101). Mrs. Alexander testified that she and her husband viewed Mr. Miller through the windows of their neighbor's enclosed porch. (R-45,26). Ralph Metz, an investigator for the Public Defender's Office testified that the distance between the enclosed porch and the street was fifty-nine feet. (R-108-111). The Alexanders never came out of the house to view Mr. Miller, and were together when they made their identifications. (R-102). While Mr. and Mrs. Alexander were making their identifications, Lambeseder, Santillo, and Devoy were outside with Mr. Miller, and Firth was on the porch with the Alexanders. (R-70,101). Mr. Alexander testified that before making his identification, he observed the officer walk Mr. Miller, who was handcuffed, around the front of the squad car. (R-60,70-71). Mrs. Alexander testified that she observed the officer take Mr. Miller out of the squad car, but could not remember if Mr. Miller was handcuffed. (R-43-44). Both Mr. and Mrs. Alexander testified that at the time they viewed Mr. Miller, he was not wearing a hat. (R-44,71). Mrs. Alexander stated that Mr. Miller was wearing the same clothing that she saw when the man ran past her earlier. (R-27).

Mr. and Mrs. Alexander identified Mr. Miller as the man they saw running out of their neighbor's house that day. (R-26-27,60-61). Mrs. Alexander stated that she identified Mr. Miller because he was the man she saw in her neighbor's house, and she did not need to be any closer to make the identification, because she could see Mr. Miller from the porch. (R-47). Both Mr. and Mrs. Alexander testified that Mr. Miller was the only person shown to them. (R-45,71). No lineup was ever conducted. (R-102).

Mr. Miller testified that on October 8, 2000, he was doing carpentry work for Velma Thomas who lives at 1310 Foster. (R-123-124). Mr. Miller testified that he was putting down a new floor for Ms. Thomas, and used a pry bar, hammer and nails to do this. (R-124). Mr. Miller finished work that day around 5:00 or 5:15 p.m., and was walking to the el station to go home when he spotted some junk in the alley between Maple and Ridge. (R-124-125,135-136). Miller testified that he had been salvaging in that area before, so he went down the alley to look around. (R-125). In the alley behind an apartment building just in front of Ridge and Leonard, Mr. Miller discovered a roll of carpet that he thought could be put over the new flooring he installed at Ms. Thomas' house that day. (R-125,142). Miller stated that he intended to go back to the area where Ms. Thomas lived to see if he could find someone to give him a ride, and help him bring the carpet back to Ms. Thomas' house. (R-126). Miller testified that he exited the alley in between some buildings onto Ridge and Leonard, walked to the curb, and then encountered an officer who was parked at the stop sign at Ridge and Leonard. (R-127-128). Miller stated that he was not running, sweating or out of breath at this time. (R-127). Miller testified that he brought the pry bar with him that he used to put down the flooring at Ms. Thomas' house that day, and always carried the Swiss Army knives with him because they were a gift from Ms. Thomas. (R-124-125). Miller stated that all of the property recovered from him by the officer that day belonged to him. (R-128). Miller testified that he did not burglarize the house that day. (R-129-130).

Miller stated that the officer kept him at Leonard and Ridge for five to ten minutes, before he was taken in the squad car to 2205 Sherman. (R-128). Miller testified that while he was handcuffed and held at Leonard and Ridge, one of the officers put a hat on his head and said "here's the hat you lost at the scene." (R-128-129). Miller told the officers that the hat did not

-10-

belong to him, and tried to remove it after he was put into the squad car. (R-129). At 2205 Sherman, Miller waited in the squad car for fifteen minutes while the officers went inside the house. (R-129). Miller stated that the officer stood him outside the door of the squad car, put the hat back on his head, and turned him around to face some houses. (R-129).

Miller stated that he was taken from 2205 Sherman to the police station where he spoke to Detective Mitchem. (R-130-131). Miller told Mitchem that he owned a blue Rally two speed bike, but it was locked to the porch at 1310 Foster. (R-130). Detective Mitchem testified that he went to 1310 Foster that same day, and saw a Rally bike chained to the front porch at 1310 Foster. (R-146-148).

The parties stipulated that Mr. Miller was convicted of residential burglary in 1997 and 1992, and felony theft in 1990. (R-150). The parties stipulated that if called to testify, evidence technician James Ptroe would state that on October 8, 2000, he went to 2205 Sherman and processed the window and chest of drawers in the bedroom for fingerprints, but no fingerprints were recovered. (R-144-145).

Mr. Miller was convicted of residential burglary and possession of burglary tools. (R-171). The court appointed private counsel to represent Mr. Miller for the post-trial motions. (R-185,189). In the motion for a new trial, Mr. Miller's counsel argued, among other things, that Miller's trial counsel was ineffective for failing to make a motion to suppress the identification evidence. (R-211-221,C-146-162). To support the arguments in the motion, Miller's counsel attached exhibits labeled A through G. (C-10-21). The following information was contained in those exhibits and was available to Mr. Miller's trial counsel prior to and during the trial. (R-217-18, C-10-21).

-11-

The police incident report, exhibit A, described the lighting at the time of the burglary as dusk. (C-10-14). Exhibit B, an arrest photograph of Mr. Miller taken on October 8, 2000, showed that Mr. Miller had a goatee on the day the burglary occurred. (C-15). The police incident report and the officer's arrest report, exhibits A and D, both described Mr. Miller as having a beard or beard and mustache. (C-10-14,17). According to the police incident report, exhibit A, the officers received a call shortly after the burglary in which the caller stated that a short, black, male wearing dark clothing was seen running west on Garfield from Sherman and was bleeding from the head. (C-10-14). Exhibit C, the police incident dispatch detail report, stated that Mrs. Alexander called and reported the burglary at 5:36 p.m. (C-16). The arrest report, exhibit D, stated that Mr. Miller was arrested at Leonard and Ridge at 5:36 p.m. (C-17). The reply to the Public Defender's investigation request, exhibit G, stated that the distance between 2205 Sherman and Leonard and Ridge is 2,245 feet. (C-20-21). Exhibit F, the evidence technicians report, stated that the technician found no tool marks on the window frame at 2205 Sherman. (C-19).

The court denied Mr. Miller's motion for a new trial, and sentenced Mr. Miller to eighteen years imprisonment with 502 days of credit for time served. (R-235,249). This appeal follows.

-12-

## ARGUMENT

I. **Because the Identification of Mr. Miller was Vague and Doubtful, The State Failed to Prove Mr. Miller's Guilt of Residential Burglary and Possession of Burglary Tools Beyond a Reasonable Doubt.**

The State failed to prove Mr. Miller's guilt of residential burglary and possession of burglary tools beyond a reasonable doubt. The primary evidence presented against Mr. Miller at trial was the identification testimony of two witnesses. While the testimony of a single eyewitness can be sufficient to sustain a conviction, the witness' identification must be positive and the identification testimony must be credible. When Mr. and Mrs. Alexander's identifications of Mr. Miller are considered in light of their inadequate opportunity to view the offender, the vague description they provided to the police, and the improperly suggestive nature of the identification procedure itself, the Alexander's identifications of Mr. Miller are vague and doubtful, and therefore, unreliable. Thus, Mr. Miller's conviction must be reversed.

The standard of review is whether the evidence, taken in the light most favorable to the prosecution, is such that any rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. *Jackson v. Virgina*, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). However, it is the reviewing court's duty to "carefully consider the evidence [and] to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged." *People v. Ash*, 103 Ill. 2d 485, 468 N.E.2d 1153, 1156 (1984).

The Due Process Clause protects an accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S.

Const. Amend XIV; *In Re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

In considering the sufficiency of the identification evidence, the direct testimony of a single

eyewitness may be sufficient to support a conviction, if it is positive and the witness is credible.

*Ash*, 468 N.E.2d at 1157. However, an identification will not be deemed sufficient to support a

conviction if it is vague, doubtful, or uncertain. *People v. Cullotta*, 32 Ill. 2d 502, 504, 207 N.E.2d

444 (1965). The United States Supreme Court has set forth several factors to be considered in

evaluating the reliability of identification testimony. The five factors are: (1) the opportunity the

witness had to view the offender at the time of the crime; (2) the witness' degree of attention; (3)

the accuracy of the witness' prior description of the offender; (4) the level of certainty

demonstrated by the witness at the time of the identification; and (5) the length of time between

the crime and the first identification. *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d

401 (1972); *People v. Slim*, 127 Ill. 2d 302, 537 N.E.2d 317, 319 (1989). These five factors are to

be applied to the facts of the case before the trier of fact and viewed in the totality of the

circumstances, not as individually determinative. *Neil v. Biggers,* 409 U.S. at 199-200. Against

these factors should be weighed the corrupting effect of the suggestive identification itself.

*Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

### Witnesses' Opportunity to View the Offender and Degree of Attention

The first two factors, the witnesses' opportunity to view the offender at the time of the

offense and the witnesses' degree of attention, weigh in favor of finding that the identifications in

this case were unreliable. Mrs. Alexander first observed the offender as he was running straight

for her, waiving his arms over his head and screaming. (R-20,32-33). She had never seen this

man before and was so frightened that she tripped down the steps and fell to the ground. (R-20,32-34). While still lying on the ground, Mrs. Alexander said that she saw the offender's face as he ran past her two feet away, before he continued running towards a bike that was parked on the side of the house. (R-21-25,33,44). However, only seconds passed from the time the offender ran from the house to the time he reached the bike. (R-34).

Mr. Alexander heard screaming and a door slamming, and turned around just in time to see both his wife falling and the offender, who he had never seen before, standing on the steps of his neighbor's back porch. (R-52-53,62-63). Although Mr. Alexander said he saw the man's face at this time, he was frightened and standing fifteen to twenty feet away. (R-54,62-63). Mr. Alexander then followed six to eight feet behind the offender as he walked towards the bike parked on the side of the house and then led it towards the gate. (R-55-56). When the offender reached the gate, he briefly turned towards Mr. Alexander who jumped over the bike, tripped, and knocked both himself and the offender to the ground. (R-56-57). The offender immediately got up, turned his back towards Mr. Alexander and ran. (R-58-59). Mrs. Alexander observed this from four to five feet away while still lying on the ground after her fall and said it all happened in a matter of seconds. (R-23-25,34).

Thus, the Alexander's lack of attention and brief opportunity to view the offender weighs in favor of finding their identifications of Mr. Miller unreliable, where from a distance they saw the offender for only a matter of seconds, while they were both frightened and distracted by the chaotic events taking place. See *People v. Hernandez*, 312 Ill. App. 3d 1032, 729 N.E.2d 65 (1st Dist. 2000) (court found witness' lack of attention and limited time to view the offender a factor in finding the identification unreliable where witness watched argument from a distance for ten

minutes, during which time his attention was fixed on the back of the offenders' heads and he

only saw one offender's profile for a moment).

## Accuracy of the Witnesses' Prior Description of the Offender

The Alexander's prior descriptions of the offender are the third factor to consider in

determining whether their identifications of Mr. Miller were reliable. However, the descriptions

of the offender's clothing and appearance provided by the Alexanders both immediately after the

burglary and at the trial were vague, and lacked any details that could distinguish the offender

from the population at large. According to Officer Lambaseder, immediately following the

burglary, the Alexanders described the offender as male, black, short, and wearing dark clothing.

(R-81). At the trial, Mrs. Alexander testified that the offender was in his forties, wearing dark

clothing and a dark stocking hat. (R-22,25). Mr. Alexander, who is six feet tall, testified that the

man was shorter than him, in his late thirties and wearing a black coat, stocking cap, and jeans

that were black in nature, although he did not know their exact color. (R-54,63-64).  Thus, the

Alexanders vague descriptions of the offender weigh in favor of finding that the Alexander's

identifications of Mr. Miller were unreliable.

## Level of Certainty Shown by the Witnesses When Confronting the Defendant

Although Mr. and Mrs. Alexander did not express any uncertainty regarding their

identifications, which is the fourth factor in the test, the highly suggestive circumstances

surrounding their identifications of Mr. Miller reveal that this factor is not a valid indicator of the

accuracy of their recollections. Mr. and Mrs. Alexander identified Mr. Miller during a one-man

showup that took place at the scene of the burglary shortly after the burglary had occurred. (R-87-

88).

Before they made their identifications, however, the Alexanders watched Officer

Lambeseder take Miller from the back of his marked squad car, walk him around, and place him

in front of the car, where Miller stood while they made their identifications. (R-43-44,60).

Throughout this time, Officers Lambesder, Santillo, and Devoy were all outside of the house with

Miller, and Mr. Miller was handcuffed. (R-70,101).  When a suspected offender is viewed by the

witnesses for identification under circumstances in which he is handcuffed and standing amongst

uniform police officers, it is hard for the witnesses to escape the "suggestion that what they are

being told is: This is the man!"  *People v. Carroll*, 12 Ill. App. 3d 869, 874, 299 N.E.2d 134,138

(1973) (showup where defendant was viewed while handcuffed and standing between two

uniformed officers unnecessarily suggestive and improper).

Further adding to the suggestive nature of the identification procedure employed in the

present case,  Mr. and Mrs. Alexander made their identifications of Miller in each others presence,

and could not recall if they had made their identifications at the same time or if one of them had

identified him first. (R-45,71,102).  See *People v. Blumenshine*, 42 Ill. 2d 508, 513, 250 N.E.2d

152 (1969). (improper to allow multiple witnesses to view the defendant for identification at the

same time and place).  Additionally, the Alexanders viewed Mr. Miller from a distance of nearly

sixty feet away, by looking through the windows of their neighbor's enclosed porch, and the

Alexanders never came outside the porch to get a closer look. (R-26,45,102,108-111).  Also, Mr.

Miller's testimony indicated that the police put the offender's hat, which was left behind at the

scene, on Miller's head before his identification by the Alexanders, even though he told the

officers that it was not his. (R-129).

In addition, prior to being brought to the scene for the showup, Lambaseder took Mr.

-17-

Miller into custody while at Leonard and Ridge. (R-86-88). The officers did not bring anyone else

with them to 2205 Sherman besides Mr. Miller, and a lineup was never conducted. (R-45,71,102).

The practice of one-man showups has been condemned due to the dangerous degree of improper

suggestion inherent in such a showing. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 181

L. Ed. 2d 1199 (1967); *People v. Wright*, 126 Ill. App. 2d 91, 94, 261 N.E.2d 445 (1st Dist. 1970).

Therefore, Mr. and Mrs. Alexander's level of certainty is not persuasive in light of the highly

suggestive circumstances of the identifications. *See Id; People v. Carroll*, 12 Ill. App. 3d at 874

(both found one-man showup where the defendant was viewed by witnesses while handcuffed was

unnecessarily suggestive); *People v. Lee*, 44 Ill. 2d 161, 168-169, 254 N.E.2d 469 (1969) (finding

identification procedure in which defendant was handcuffed to a previously identified suspect

improperly suggestive).

Furthermore, as the Supreme Court stated in *Biggers*, the reliability of an identification is

determined by viewing all the factors in the totality of the circumstances; each factor is not

individually determinative. The Court also admonished that the corrupting effect of the

suggestive identification itself must be considered as well. *Manson v. Brathwaite*, 432 U.S. at

114. Thus, the fact that Mr. and Mrs. Alexander did not express any uncertainty regarding their

identifications is not determinative considering the totality of the circumstances, and it is

outweighed by the highly suggestive nature of the identification procedure itself.

### Length of Time Between the Offense and the Identification

The fifth factor in the *Biggers* test is the time that elapsed between the incident and the

identification. Although the Alexanders identified Mr. Miller shortly after the burglary occurred,

when viewed in the totality of the circumstances, the *Biggers* factors show that Mr. and Mrs.

-18-

Alexander's identifications of Mr. Miller were unreliable. The Alexanders did not have a good opportunity to view the offender because the entire incident from start to finish took only seconds, and both Mr. and Mrs. Alexander were frightened and distracted. In addition, the Alexander's descriptions of the offender were vague and failed to include any characteristics that could distinguish the offender from the population at large. Finally, the certainty the Alexanders displayed when making their identifications of Mr. Miller was undermined by the unnecessarily suggestive showup identification where Mr. Miller was viewed by the Alexanders while he was handcuffed and standing in front of a marked squad car in the presence of three police officers.

Further, the remaining evidence presented at Mr. Miller's trial showed only that Miller was stopped by Lambaseder after exiting an alley in the general area where the burglary occurred. No fingerprints were recovered from the scene, and none of the proceeds from the burglary were found in Mr. Miller's possession. (R-93-94,144-145). Although Firth testified that he observed tool marks on the window at 2205 Sherman and Miller was found with a pry bar and two Swiss Army knives in his possession, there was no direct evidence presented to connect the tool marks found at the scene to the pry bar or Swiss Army knives in Mr. Miller's possession. (R-107,86-87). In addition, Mr. Miller provided an explanation for his possession of these items that day. Mr. Miller stated that he had used the pry bar earlier that day to lay down a new floor in Ms. Thomas' home, and he carried the Swiss Army knives with him because they were a gift from his employer. (R-123-125).

Mr. Miller also provided an innocent explanation for his presence near the scene of the burglary that day. Miller testified that he was on his way home from work and headed towards the el, when he spotted some junk in an alley. (R-124-125,135-136). Miller had been salvaging in

-19-

that area before, so he went to have a closer look around and found a roll of carpet that he thought could be put over the new floor he had installed in Ms. Thomas' home. (R-125,142). When Lambaseder stopped him, Miller was on his way back towards Ms. Thomas' house to find someone to help him transport the carpet. (R-126-128).

Although Lambaseder initially testified that he saw Miller running in between buildings before he stopped him at Leonard and Ridge, during cross-examination Lambaseder admitted that he could not have seen in between these buildings from where he was sitting that day, and could only state that he saw Miller running from the time he exited the alley to the time he reached the street, which is a distance of only twenty yards. (R-83,90-92). Lambaseder testified that Miller was out of breath and sweaty when he stopped him, but failed to include this in his report. (R-85,119-120).

Finally, the offender left his bike behind at the scene of the burglary, which the Alexanders described as dark or blue. (R-24,58-59,44,64). Miller told Detective Mitchem that his bike, a blue Rally two speed, was chained to the porch at Ms. Thomas' house. (R-130). That same day, Mitchem went to Ms. Thomas' house and verified that the bike was in fact there. (R-146-148).

In the present case, the Alexander's vague and doubtful identification testimony renders their identifications of Mr. Miller as the offender unreliable, and together with the purely circumstantial evidence presented against Mr. Miller at trial, are insufficient to sustain Miller's conviction. Therefore, the State failed to prove Mr. Miller's guilt of residential burglary and possession of burglary tools beyond a reasonable doubt and Mr. Miller's conviction should be reversed.

II.    **The Trial Court Erred When it Denied Mr. Miller's Motion for a New Trial, Because Miller's Trial Counsel Provided Ineffective Assistance When He Failed to Make a Motion to Suppress the Identification Evidence.**

The trial court erred when it denied Mr. Miller's motion for a new trial based on his trial counsel's failure to make a motion to suppress the identification evidence. The primary evidence presented against Miller at his trial was the identification testimony of Mr. and Mrs. Alexander. However, the identifications were the result of an unnecessarily suggestive showup where Miller was the only person brought to the scene and viewed by the Alexanders while standing in front of a marked squad car, handcuffed, and in the presence of three police officers. In addition, the totality of the circumstances shows that the identifications were not reliable, because the Alexanders had an inadequate opportunity to view the offender, the descriptions they provided were vague, and the certainty they displayed in making their identifications was undermined by the suggestiveness of the identification procedure itself. As a result, Mr. Miller's trial counsel was ineffective for failing to make a motion to suppress the identification evidence because such a motion would have had a likelihood of success and the outcome of the trial would have been different. Thus, the trial court erred when it denied Miller's motion for a new trial, and Mr. Miller's conviction should be reversed and this case remanded for a new trial, or in the alternative, this case should be remanded for a hearing on the motion to suppress.

The proper standard of review is whether the trial court's denial of the defendant's motion for a new trial was an abuse of its discretion. *People v. Abdullah*, 2002 Ill. App. Lexis 1177, *17 (4th Dist. 2002). A defendant has a right to effective assistance of counsel. VI, XIV; Ill. Const., art. I, sec. 8; *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Defense counsel is ineffective where his performance falls below an objective standard of reasonableness and there is a reasonable probability that, but for his performance, the result would have been different. *Strickland v. Washington*, 466 U.S. 668. Whether defense counsel's failure to make a motion to suppress will be deemed ineffective depends on whether the decision not to file the motion may be viewed as a reasonable tactical decision, and whether there is a reasonable probability that the outcome would have been different had the motion been filed. E.g., *People v. Follins*, 196 Ill. App. 3d 680, 554 N.E.2d 345 (1st Dist. 1990). *See also, People v. Brinson*, 80 Ill. App. 3d 388, 399 N.E.2d 1010 (2nd Dist. 1980) (evidence at trial showed a suggestive identification and that defendant's confession was reasonably vulnerable to attack; therefore, defense counsel ineffective for failing to file a motion to suppress); and *People v. Stewart*, 217 Ill. App. 3d 373, 577 N.E.2d 175 (3rd Dist. 1991) (where question of probable cause was a close one, counsel's failure to move to suppress was unreasonable and undermined confidence in outcome); and *People v. Fernandez*, 162 Ill. App. 3d 981, 516 N.E.2d 366 (1st Dist. 1987) (defense counsel was ineffective for failing to file a motion to suppress statements where confessions were reasonably vulnerable to attack due to mental handicaps of the defendants).

In the present case, defense counsel's failure to file a motion to suppress cannot be viewed as a reasonable tactical decision. The key issue to be determined at trial was Mr. Miller's identity as the offender. The primary evidence linking Miller to the crime was the identification testimony of Mr. and Mrs. Alexander. The Alexanders made their identifications of Mr. Miller at the scene and in each other's presence, while Miller was standing alone, in front of a marked squad car, handcuffed and in the presence of three police officers. (R-43-45,60,70,87-88,101).

Mr. Miller testified that he did not commit this crime, and was in the area when stopped by

-22-

the police that day because he was doing carpentry work for a woman who lived nearby, and on his way home he saw a roll of carpet in the alley that he thought could be used for a project at work. (R-123-125,129-130,135-136,142) Thus, where the primary evidence implicating Mr. Miller in the crime was the product of a highly suggestive showup, and where the defense at trial was mistaken identification, counsel's failure to challenge the identification was deficient. It was clearly outside the wide range of professionally competent assistance.

Counsel's failure to file a motion to suppress the identification evidence was also prejudicial. The record demonstrates that had such a motion been filed, there is a likelihood that the primary evidence implicating the defendant would have been suppressed. In deciding whether to permit a witness to give identification testimony, the trial court must first determine whether the pretrial identification procedures employed were suggestive. After an identification procedure is determined to be unnecessarily suggestive, the court must next determine "whether under the totality of the circumstances the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 189, 93 S. Ct. 375, 34 L. Ed 2d 401 (1972). *See also, Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed.2d 140 (1977). The factors to be considered in evaluating the reliability of an identification and the likelihood of misidentification include: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id* at 114, *discussing Neil v. Biggers*, 409 U.S. at 199-200. Against these factors should be weighed the corrupting effect of the suggestive identification itself. *Brathwaite*, 432 U.S. at 114.

In the present case, Mr. and Mrs. Alexander identified Mr. Miller during a one-man

-23-

showup that took place at the scene of the burglary shortly after the burglary had occurred. (R-87-88). Prior to the showup, Lambaseder placed Miller in handcuffs and put him in the back of his squad car while still at Leonard and Ridge, and the arrest report introduced during the motion for new trial indicated that he had been arrested at that time. (R-86-88,C-17).

Before they made their identifications, the Alexanders watched Officer Lambeseder take Miller from the back of his marked squad car, walk him around, and place him in front of the car, where Miller stood while they made their identifications. (R-43-44,60). Throughout this time, Officers Lambesder, Santillo, and Devoy were all outside of the house with Miller, and Mr. Miller was handcuffed. (R-70,101). When a suspected offender is viewed by the witnesses for identification under circumstances in which he is handcuffed and standing amongst uniform police officers, it is hard for the witnesses to escape the "suggestion that what they are being told is: This is the man!" *People v. Carroll*, 12 Ill. App. 3d 869, 874, 299 N.E.2d 134,138 (1973) (showup where defendant was viewed while handcuffed and standing between two uniformed officers unnecessarily suggestive and improper).

Further adding to the suggestive nature of the identification procedure employed in the present case, Mr. and Mrs. Alexander made their identifications of Miller in each others presence, and could not recall if they had made their identifications at the same time or if one of them had identified him first. (R-45,71,102). See *People v. Blumenshine*, 42 Ill. 2d 508, 513, 250 N.E.2d 152 (1969). (improper to allow multiple witnesses to view the defendant for identification at the same time and place). Additionally, the Alexanders viewed Mr. Miller from a distance of nearly sixty feet away, by looking through the windows of their neighbors enclosed porch. (R-26,45,108-111). The Alexanders never came outside the porch to get a closer look, and according to the

-24-

police report introduced during the motion for new trial, when the Alexanders made their identifications of Mr. Miller, the lighting outside could be described as dusk. (R-102,C-10-14). Also, Mr. Miller's testimony indicated that the police put the offender's hat, which was left behind at the scene, on Miller's head before his identification by the Alexanders, even though he told the officers that it was not his. (R-129).

Additionally, the officers did not bring anyone else with them to 2205 Sherman besides Mr. Miller, and a lineup was never conducted. (R-45,71,102). Therefore, the one-man showup of Mr. Miller was unnecessarily suggestive, and thus, conducive to a mistaken identification. *See People v. Wright,* 126 Ill. App. 2d 91, 94, 261 N.E.2d 445 (1st Dist. 1970); *People v. Carroll,* 12 Ill. App. 3d at 874 (both found one-man showup where the defendant was viewed by witnesses while handcuffed was unnecessarily suggestive); *People v. Lee,* 44 Ill. 2d 161, 168-169, 254 N.E.2d 469 (1969) (finding identification procedure in which defendant was handcuffed to a previously identified suspect improperly suggestive).

Had counsel moved to suppress the identification testimony, the State would have been required to demonstrate that the identification was reliable even though the confrontation procedure was suggestive. *Manson v. Brathwaite,* 432 U.S. at 114; *See also People v. Goodman,* 109 Ill. App. 3d 203, 440 N.E.2d 345. 354 (1st Dist. 1992). However, as discussed in Issue I, *supra,* the witnesses' identifications of Mr. Miller when viewed under the totality of the circumstances were not reliable, and therefore, the identification evidence in the present case cannot be determined to have a basis independent of the suggestive procedure.[1]

---

[1] These same five factors were used in Argument I to evaluate the reliability of the eyewitnesses' identification testimony. The factors apply to both the reasonable doubt argument raised in Argument I and the argument concerning counsel's failure to file a motion to suppress

### Witnesses' Opportunity to View the Offender and Degree of Attention

The first two factors to consider are the witnesses' opportunity to view the offender at the time of the offense and the witnesses' degree of attention. Mrs. Alexander first observed the offender, who she had never seen before, as he was running straight for her, waiving his arms over his head and screaming. (R-20,32-34). Mrs. Alexander was so startled, she tripped down the porch steps and fell to the ground, where she saw the offender from two feet away as he ran past her and again from four to five feet away as the man struggled with her husband over a bike. (R-20-25,32-34,44).

After he heard screaming and a door slamming, Mr. Alexander, who was fifteen to twenty feet away, turned around just in time to see both his wife falling from the porch and the offender, who he had never seen before, standing on the top of the porch steps. (52-53,62-63). Mr. Alexander followed six to eight feet behind, as the offender walked towards his bike and began leading it towards the gate on the side of the house. (R-55-56). Mr. Alexander saw the offender's face as he jumped and tripped over the bike knocking both himself and the offender to the ground. (R-56-57). After falling, the offender immediately got up, turned around, and ran from the scene. (R-58-59). The entire incident from start to finish took only seconds and according to the police report attached to Mr. Miller's motion for a new trial, the lighting outside could be described as dusk. (R-34,C-10-14).

Thus, the Alexanders observed the offender, who they had never seen before, for a matter of seconds, from a distance and under poor lighting conditions, while they were both frightened and distracted by the chaotic events taking place. Therefore, the Alexander's identifications of

---

the identification testimony raised in Argument II.

Mr. Miller based on such a limited opportunity to view the offender weigh in favor of finding that the identifications were not reliable. *See People v. Hernandez*, 312 Ill. App. 3d 1032, 729 N.E.2d 65 (1st Dist. 2000) (lack of attention and the limited time to view the offenders was a positive factor in the court's determination that the identification was unreliable).

## Accuracy of the Witnesses' Prior Description of the Offender

The Alexander's prior descriptions of the offender's clothing and appearance both immediately following the burglary and at the trial, weigh in favor of finding that their identifications of Mr. Miller were unreliable. According to Officer Lambaseder, the Alexanders described the offender immediately following the burglary as male, black, short, and wearing dark clothing. (R-81). However, the police incident dispatch detail report, introduced during Mr. Miller's motion for a new trial, indicated that the Alexanders actually described the offender as male, black, short, wearing a black knit cap and clothing that was "not real dark." (C-16). It was not until the trial that Mrs. Alexander stated that the offender was in his forties, wearing dark clothing and a dark stocking hat, while Mr. Alexander testified that the offender was in his late thirties, shorter than six feet tall, and wearing a stocking hat, dark jeans, and a black coat. (R-22,25,54,63-64).

The Alexanders never stated that the offender had a goatee or noticeable facial hair of any kind. However, Mr. Miller's arrest photo, the police incident report, and the officer's arrest report, which were introduced during the motion for new trial, all clearly establish that on the day of the burglary Mr. Miller had a noticeable goatee. (C-10-17). Thus, the Alexander's vague and conflicting descriptions of the offender together with their failure to mention any distinguishing characteristics, such as facial hair, when it was clearly established that Miller had a goatee on the

-27-

day of the burglary, all weigh in favor of finding that the Alexander's identifications of Mr. Miller were unreliable.

### Level of Certainty Shown by the Witnesses When Confronting the Defendant

Although Mr. and Mrs. Alexander did not express uncertainty regarding their identifications, the fourth *Biggers* factor, the highly suggestive circumstances surrounding their identifications of Mr. Miller reveal that this factor does not validly indicate the reliability of their identifications. The Alexanders made their identifications of Mr. Miller after a one-man showup, which took place at the scene of the burglary shortly after it occurred. (R-87-88). Mr. and Mrs. Alexander viewed Miller while he was standing in front of a marked squad car, and handcuffed in the presence of three police officers. (R-43-44,60,70,101). In addition, the Alexanders made their identifications of Miller in each others presence, at dusk from nearly sixty feet away while inside their neighbor's enclosed front porch. (R-26,45,108-111, C-10-14). No one else was brought to the scene for the Alexanders to view and no lineup was ever conducted. (R-45,71,102).

Although the Alexanders identified Mr. Miller as the offender at the scene, their level of certainty is not persuasive in light of the highly suggestive circumstances of the identifications. *See People v. Wright,* 126 Ill. App. 2d 91, 94, 261 N.E.2d 445 (1st Dist. 1970); *People v. Carroll,* 12 Ill. App. 3d at 874 (both found one-man showup where the defendant was viewed by witnesses while handcuffed was unnecessarily suggestive); *People v. Lee,* 44 Ill. 2d 161, 168-169, 254 N.E.2d 469 (1969) (finding identification procedure in which defendant was handcuffed to a previously identified suspect improperly suggestive). Furthermore, as the Supreme Court stated in *Biggers*, the reliability of an identification is determined by viewing all of the factors in the totality of the circumstances; each factor is not individually determinative. The Court also

-28-

admonished that the corrupting effect of the suggestive identification itself must be considered as well. *Manson v. Brathwaite*, 432 U.S. at 114. Thus, the fact that Mr. and Mrs. Alexander did not express any uncertainty regarding their identifications is not determinative considering the totality of the circumstances, and it is outweighed by the highly suggestive nature of the identification procedure itself.

### Length of Time Between the Offense and the Identification

The final factor to be considered is the length of time between the offense and the identification. Although the showup took place a short time after the robbery occurred, this does not cure the other problems associated with Mr. And Mrs. Alexander's identifications of Miller. The Alexanders did not have a good opportunity to view the offender because the entire incident took only seconds, and both Mr. and Mrs. Alexander were frightened and distracted by the events taking place. The Alexander's descriptions of the offender were vague and conflicting and failed to include any distinguishing characteristics, such as facial hair, when it was clearly established that on the day of the burglary Mr. Miller had a noticeable goatee. Finally, the certainty the Alexanders displayed when making their identifications of Mr. Miller was undermined by the unnecessarily suggestive circumstances surrounding the showup identification itself.

The remaining evidence presented against the defendant showed only that Miller was stopped by Lambaseder after exiting an alley in the general area where the burglary occurred. No fingerprints were recovered from the scene, and none of the proceeds from the burglary were found in Mr. Miller's possession. (R-93-94,144-145). Although Miller was found with a pry bar and two Swiss army knives in his possession and Officer Firth testified that he saw tool marks around the window at the scene, the evidence technician's report introduced during the motion for

-29-

new trial indicated that no tool marks were in fact found. (R-86-87,107,C-19).

Mr. Miller provided an innocent explanation for his presence near the scene of the burglary that day, and testified that he was doing carpentry work for a woman who lived nearby, when on his way home he saw a roll of carpet in the alley that he thought could be used for a project at work. (R-124-125,135-136,142). When Lambaseder stopped him, Miller was on his way back towards his employer's house to find someone to help transport the carpet. (R-126-128).

The police records introduced during the motion for new trial further support Miller's explanation for his presence in the area that day. The records indicate that the Alexanders reported the burglary at 5:36 p.m. (C-16). These same records indicate that Lambaseder arrested Miller at Leonard and Ridge at 5:36 p.m. as well, which is a distance of 2,245 feet, or roughly a half of a mile, from the scene of the burglary. (C-17,20-21). Thus, based on these facts, Mr. Miller would have had to travel a half of a mile in under a minute to make his participation in the offense plausible.

Although Lambaseder initially testified that he saw Miller running in between buildings, during cross-examination he admitted that he could only see Miller running from the time he exited the alley to the time he reached the street, which was a distance of twenty yards. (R-85,119-120). Lambaseder also testified that Mr. Miller was out of breath and sweaty when he stopped him, but failed to include this information in his report. (R-85,119-120). In addition, the police report introduced during the motion for a new trial showed that the officers received a call shortly after the burglary occurred from a witness who saw a man matching the offender's description who was bleeding from the head and running in the direction last reported by Mr. Alexander, however, there was no evidence that Miller's head was bleeding on the day of the burglary. (C-10-

-30-

14).

Under the totality of the circumstances, the question of the reliability of the identification evidence was close. Thus, there was a reasonable probability that the motion to suppress the identification would have succeeded, and since the primary evidence presented against Mr. Miller at trial was the identification testimony of the Alexanders, the outcome of the case would have been different. Therefore, the trial court erred when it failed to grant Mr. Miller's motion for a new trial and Miller's conviction should be reversed and remanded for a new trial, or in the alternative, this case should be remanded for a hearing on the motion to suppress.

III.    **The Mandatory Class X Sentencing Provision of 730 ILCS 5/5-5-3(c)(8) Violates the Right of a Defendant to Due Process and Trial by Jury Because it Subjects the Defendant to Increased Punishment Without Notice or a Jury Finding Upon Proof Beyond a Reasonable Doubt of the Facts Qualifying the Defendant for Sentencing as a Class X Offender.**

The court found Mr. Miller guilty of the Class One offense of residential burglary. (R-171); 720 ILCS 5/19-3 (West 2002). A conviction for a Class One offense exposes a defendant to a term of imprisonment of not less than four years and not more than fifteen years. 730 ILCS 5/5-8-1 (a)(4) (West 2002). At Mr. Miller's sentencing hearing, however, the court determined that it was required to sentence him as a Class X offender, exposing him to a sentence of imprisonment of not less than six years and not more than thirty years, because of the timing, degree, and sequence of his prior convictions. (R-249); 730 ILCS 5/5-5-3(c)(8) (West 2002); 730 ILCS 5/5-8-1 (a)(3) (West 2002). The court sentenced Mr. Miller to eighteen years imprisonment. (R-249). The statute under which this sentence was imposed is unconstitutional under the Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

The Class X sentencing provision of 730 ILCS 5/5-5-3(c)(8) provides that the court is required to sentence the defendant as a Class X offender when a defendant over the age of 21 is convicted of a Class One or Class Two felony after having been twice convicted of a Class One or Class Two felony in Illinois, and such charges are separately brought and tried and arise out of a different series of acts, and the first felony was committed after the effective date of the

-32-

amendatory act, the second felony was committed after conviction of the first, and the third felony was committed after conviction of the second.  730 ILCS 5/5-5-3(c)(8).

The State is not required to give the defendant notice that it is seeking to sentence him as a Class X offender. *People v. Jameson*, 162 Ill. 2d 282, 642 N.E.2d 1207 (1994).  The statute contains no provision for a jury determination of whether the qualifying facts of section 5-5-3(c)(8) exist.  Proof beyond a reasonable doubt of the qualifying conviction is not required before the court can impose a Class X sentence on a defendant convicted of only a Class One or Class Two offense. *People v. Williams*, 149 Ill. 2d 467, 599 N.E.2d 913 (1992).

Because the statute under which Mr. Miller was sentenced increased the applicable maximum penalty without any requirement of notice of the facts that subjected him to that increased penalty or a jury determination of whether those facts exist upon proof beyond a reasonable doubt, Miller's Class X sentence must be vacated and the cause must be remanded for sentencing as a Class One offender.  See *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); but see *People v. Wallace*, _Ill. App. 3d_, _N.E.2d_ (1st Dist. 2002) *(No. 1-00-0311, January 18, 2002)*; *People v. Dunn*, _Ill. App. 3d_, _N.E.2d_ (1st Dist. 2001) (No. 1-99-3304, November 8, 2001); *People v. Echols*, 325 Ill. App. 3d 515, 758 N.E.2d 878 (1st *Dist. 2001)*; *People v. Ramos*, 318 Ill. App. 3d 181, 742 N.E.2d 763 (1st Dist. 2000); *People v. Lathon*, 317 Ill. App. 3d 573, 740 N.E.2d 377 (1st Dist. 2000); People v. Roberts, 318 Ill. App. 3d 719, 743 N.E.2d 1025 (1st Dist. 2000) (section 5-5-3(c)(8) does not violate due process).  The constitutionality of a statute is a question of law which is reviewed de novo. *People v. Fisher*, 184 Ill. 2d 441, 448, 705 N.E.2d 67 (1998).

In *Apprendi*, the United States Supreme Court held that the constitution requires that a

-33-

defendant receive notice of any fact that increases the prescribed range of penalties for an offense, other than a prior conviction, and that fact must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. The *Apprendi* Court noted that in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), it had concluded that the failure of an indictment to allege a prior conviction that subjected the defendant to an increased punishment was not a violation of due process. *Apprendi*, 530 U.S. at 487-88. The Court attributed that result to the fact that recidivism is probably the most traditional basis for a sentencing court to increase an offender's sentence, as well as the certainty that procedural safeguards had attached to any fact of prior conviction. *Apprendi*, 530 U.S. at 488-89. But the *Apprendi* Court stated that it was arguable that *Almendarez-Torres* was incorrectly decided and that the *Apprendi* case would require a different result if the recidivist issue were contested. *Apprendi*, 530 U.S. at 488-490. In fact, Justice Thomas, the fifth and deciding Justice in *Almendarez-Torres*, admitted in his *Apprendi* concurrence that he decided *Almendarez-Torres* wrongly:

> [O]ne of the chief errors of Almendarez-Torres–an error to which I succumbed–was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase an offender's sentence....For the reasons I have given, it should be clear that this approach just defines away the real issue. What matters is the way by which a fact enters into the sentence. If a fact is by law the basis for imposing or increasing punishment–for establishing or increasing the prosecution's settlement–it is an element.

*Apprendi*, 530 U.S. at 520-521 (Thomas, J., concurring).

It should be noted that the *Almendarez-Torres* majority expressed no view on whether a heightened standard of proof might apply to sentencing determinations which bear significantly on the severity of the sentence, as that issue was not raised in that case because the defendant

-34-

admitted his recidivism at the time that he pled guilty. *Almendarez-Torres*, 523 U.S. at 248.

In the present case, the information that charged Mr. Miller gave him no notice that he qualified for sentencing as a Class X offender. (C-23-26). Thus, Mr. Miller was not afforded the right to have the trier of fact decide if his prior convictions qualified him for Class X sentencing. The State was never required to prove beyond a reasonable doubt that the specific timing, degree, number, and sequence of Mr. Miller's prior convictions established his eligibility for a Class X sentence.

Because *Apprendi* calls into question whether *Almendarez-Torres* was correctly decided, this Court should conclude that the reasoning of Apprendi applies to sentencing enhancement factors even when based on prior convictions. Because section 5-5-3(c)(8) contains no provision for notice in the indictment, trial by jury, or proof beyond a reasonable doubt of the qualifying factors, this Court should hold the statute violates a defendant's right to trial by jury and due process.

Even if this Court declines to find that the authority of *Almendarez-Torres* is questionable, it should still find the statute unconstitutional, because it violates Mr. Miller's right to due process and trial by jury with respect to qualifying facts contained in section 5-5-3(c)(8) beyond the mere fact of the prior convictions. If the State is not required to give notice of the prior convictions in the indictment and prove them to a jury beyond a reasonable doubt, it should be required to prove to a jury beyond a reasonable doubt that the sequence in which the convictions occurred qualified Mr. Miller for Class X sentencing, *i.e.*, that Miller is over the age of 21 and the first felony was committed after the effective date of the amendatory act, the second felony was committed after conviction of the first, and the third felony was committed after conviction of the second.

-35-

Mr. Miller was denied due process and his right to trial by jury with respect to the qualifying facts.

Should this Court conclude that *Apprendi* does not require notice and a jury finding of proof beyond a reasonable doubt, it should nonetheless find the statute unconstitutional. As interpreted by the Illinois Supreme Court in *Williams,* section 5-5-3(c)(8) imposes no burden of proof beyond that existing in any ordinary sentencing proceeding, although the maximum penalty that the defendant faces at least doubles if the court finds that he qualifies for sentencing as a Class X offender. *People v. Williams*, 149 Ill. 2d 467, 599 N.E.2d 913 (1992). Yet as suggested by *Almendarez-Torres*, sentencing determinations that bear significantly on the severity of the sentence may be subjected to a heightened standard of proof. *Almendarez-Torres*, 523 U.S. at 248.

A person convicted of a Class One offense faces a maximum sentence of 15 years, whereas if he qualifies for sentencing as a Class X offender, the maximum penalty increases to 30 years. 730 ILCS 5/5-8-1(a)(3); 730 ILCS 5/5-8-1(a)(4) (West 2002). Thus, in this case, the maximum penalty doubles if the Court finds the qualifying facts. Because section 5-5-3(c)(8) subjects a defendant to a considerable increase in his sentence should he qualify for Class X sentencing, due process requires that the facts qualifying defendant for sentencing as a Class X offender at least be proven by a standard of proof greater than that required at the routine sentencing hearing. Because the statute contains no requirement of a heightened standard of proof, it is unconstitutional. Although in *People v. Childress*, 321 Ill. App. 3d 13, 37, 746 N.E.2d 783 (1st Dist. 2001) this Court held that imposing extended-term sentences based on prior convictions does not violate *Apprendi*, the defendant respectfully suggests that, for the foregoing reasons, *Childress* was wrongly decided.

-36-

The issue of constitutionality of section 5-5-3(c)(8) was not raised in the Circuit Court. However, in *People v. Wagener*, 196 Ill. 2d 269, 752 N.E.2d 430 (2001), the Illinois Supreme Court recognized that an *Apprendi* issue attacks the constitutionality of the statute and trial court's authority to impose sentence, so the issue may be raised at anytime on direct appeal. *Id* at 279-280; see also *People v. Zeisler*, 125 Ill. 2d 42, 49, 531 N.E.2d 24 (1988) (A constitutional challenge to a statute can be raised at any time, as an unconstitutional statute is void ab initio, which means it is, "in legal contemplation, as though no such law had ever been passed."). Such void judgments can be attacked at any time. *People v. Arna,* 168 Ill. 2d 107, 113, 658 N.E.2d 445 (1995). Therefore, this argument has not been waived. *People v. Clifton*, 321 Ill. App. 3d 707, 728, 750 N.E.2d 686 (1ˢᵗ Dist. 2001).

Because section 5-5-3(c)(8) is unconstitutional in light of *Apprendi*, Mr. Miller's eighteen year sentence must be vacated, and the cause remanded for him to be resentenced as a Class One offender.

IV.    **This Case Should be Remanded for the Trial Court to Properly Admonish Mr. Miller Pursuant to Supreme Court Rule 605(a), Because the Court Failed to Advise Mr. Miller of His Right to File a Written Motion to Reconsider Sentence, and That This Motion was Necessary to Preserve Issues for Appellate Review.**

Mr. Miller's case should be remanded in order for the trial court to provide proper admonishments in accordance with Supreme Court Rule 605(a). The record shows that although the trial court properly admonished the defendant of his right to appeal his conviction, it did not admonish the defendant of his right to file a written motion to reconsider sentence, and that this motion was necessary in order to ensure that any sentencing issues he wished to raise on appeal were preserved. Since the trial court failed to properly admonish Mr. Williams pursuant to Supreme Court Rule 605(a), this case must be remanded to the trial court for proper admonishments.

Supreme Court Rule 605(a) requires that, at the time of imposing sentence, the trial court admonish the defendant of his right to file a written motion to reconsider sentence in that court. S. Ct. R. 605(a)(3)(B) (West 2002). The rule further requires the trial court to admonish the defendant that he must file such a motion to preserve any issue relating to his sentence for appellate review. S. Ct. R. 605(a)(3)(B); S. Ct. R. 605(a)(3)(C). Where a defendant is not properly advised by the court of the requirements set out in Rule 605(a), the case should be remanded. *People v. Mazar*, 333 Ill. App. 3d 244, 254-59, 755 N.E.2d 135 (1st Dist. 2002).

In *Mazar*, the defendant argued that the trial court's failure to admonish him of the need to file a motion to reconsider his sentence to preserve sentencing errors for appeal denied his right to due process. *Id* at 254. This court held that even though Supreme Court Rule 605(a) did not

require such admonishments at the time of *Mazar's* trial, because the subsequently amended version of Rule 605(a) required such admonishments, and because *Mazar* was misinformed due to the omission of the admonishment, fundamental fairness required the case be remanded for proper admonishments and to give the defendant a chance to attack his sentence. *Id* at 259. There is no factual dispute regarding the admonishments that were given to the defendant. Therefore, the standard of review is de novo. *People v. Smith*, 191 Ill. 2d 408, 411, 732 N.E.2d 513 (2000).

In the present case, Mr. Miller was sentenced to eighteen years imprisonment. (R-249). After announcing Mr. Miller's sentence, the court provided the following admonishment:

> Mr. Miller, let me advise you, if you wish to pursue an appeal here, you have that right. In order to start the appellate process, you must have a notice of appeal filed with the Clerk of the Circuit Court within the next 30 days. If you are indigent, you will have an appointed attorney given to you by the court system for purposes of pursuing the appeal. (R-250-251).

The admonishment given by the trial court in the present case was inadequate because it failed to make any reference whatsoever to a motion to reconsider sentence. The court failed to advise Mr. Miller that he had the right to file a written motion to reconsider sentence. In addition, the trial court failed to advise Mr. Miller that if any sentencing issue he wished to raise was not included in this written motion to reconsider sentence, it would be considered waived. Since the trial court's admonishments failed to comply with Supreme Court Rule 605(a), Mr. Miller's case, like *Mazar*, should be remanded to the trial court for proper admonishments in accordance with this rule.

For these reasons, Mr. Miller requests that the court remand his case to the trial court for proper admonitions pursuant to Supreme Court Rule 605(a).

-39-

V.    **The Mittimus Must be Amended to Reflect a Total of 503 Days of Credit Against the Sentence Where Mr. Miller's Credit Was Erroneously Computed as 502 Days.**

At Sentencing, Mr. Miller's pretrial custody credit was calculated as 502 days. (R-249). The accurate count, however, is 503 days. Therefore, Mr. Miller asks that this Court order the mittimus corrected.

Mr. Miller is statutorily entitled to credit for all "time spent in custody as a result of the offense for which the sentence was imposed." 730 ILCS 5/5-8-7(b) (2000); *Moore v. Strayhorn*, 114 Ill. 2d 538, 541, 502 N.E.2d 727 (1986). Moreover, where a defendant is held in custody for any part of the day he is entitled to credit against his sentence for that day. *People v. Donnelly*, 226 Ill. App. 3d 771, 779, 589 N.E.2d 975 (4th Dist. 1992). Because the amount of credit reflected in the mittimus is incorrect, this Court should order the issuance of a corrected mittimus reflecting the proper amount of credit for time served. *People v. Miles*, 117 Ill. App. 3d 257, 259, 453 N.E.2d 68 (4th Dist 1983). An amended mittimus may be issued at any time. *People v. Dieu*, 298 Ill. App. 3d 245, 248-50, 698 N.E.2d 663 (1998). Furthermore, this issue is not waived because the issue of proper credit under section 5-8-7(b) cannot be waived. *People v. Woodard*, 175 Ill. 2d 435, 453-457, 677 N.E.2d 935 (1997). Because this issue is purely a legal one, a de novo standard of review applies. *People v. Saunders*, 288 Ill. App. 3d 523, 525, 680 N.E.2d 790 (4th Dist. 1997).

Mr. Miller was arrested on October 8, 2000. (R-249). He was held in continuous custody through the time of his sentencing hearing on February 22, 2002. (R-249). Therefore, Mr. Miller's sentence credit should have been calculated as follows:

| | | |
|---|---|---|
| October 8, 2000 (date of arrest) | 1 | day |
| October 9, 2000-September 21, 2002 | 501 | days |

September 22, 2002 (date of sentencing)          1     day

TOTAL:                                          503   days

Failure to grant credit for the additional time would result in Mr. Miller remaining in prison longer than lawfully permitted.  Mr. Miller, therefore, asks this Court to order the mittimus amended to reflect 503 days of sentence credit.  *Donnelly*, 226 Ill. App. 3d at 779 (crediting date of arrest and date of sentencing as time served against the defendant's sentence).

## CONCLUSION

For the foregoing reasons, Robert Miller, Defendant-Appellant, respectfully requests that this Court grant the following alternative forms of relief:

1. Pursuant to Argument I, this Court should reverse Mr. Miller's conviction;

2. Pursuant to Argument II, this Court should reverse Mr. Miller's conviction and remand this case for a new trial, or in the alternative, remand this case for a hearing on the motion to suppress the identification evidence;

3. Pursuant to Argument III, this Court should vacate Mr. Miller's sentence and remand this case for resentencing;

4. Pursuant to Argument IV, this Court should remand this case for proper admonishments pursuant to Supreme Court Rule 605(a);

5. Pursuant to Argument V, this Court should order the Mittimus amended to reflect 503 days of sentence credit.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

KARI K. FIREBAUGH
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

-42-

## APPENDIX TO THE BRIEF

Index to the Record ........................................................ A-1

Judgment Order ............................................................ A-4

Notice of Appeal .......................................................... A-5

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                  **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

Complaints for Preliminary Examination (October 10, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 4,6

Arrest Report (October 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Information (November 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

State's Motion for Discovery (November 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

State's Answer to Discovery (November 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Defendant's Answer to Discovery (May 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Jury Waiver Form Signed (June 14, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Pro Se Motion for New Trial (July 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Presentence Investigation Report (July 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Transfer Order to Presiding Judge for Appointment of Counsel (August 13, 2001) . . . . . . . . 141

Appearance (September 14, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Court's Order to Prepare Trial Transcripts on June 14, 2001 (September 14, 2001) . . . . . . . 143

Court's Order to Prepare Trial Transcripts on June 15, 2001 (October 12, 2001) . . . . . . . . . 144

Letter from Defendant to Judge Orr . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

Motion for New Trial (January 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

Court's Order of the Law Firm of Addis, Greenberg Schultz & Elizer, LLC is Relieved from
Appointment of Counsel (February 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Sentencing Order (February 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Notice of Appeal (February 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

**Report of Proceedings ("R")**

|  |  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|---|
| November 8, 2000 - Arraignment |  |  |  |  |  | 3 |
| June 14, 2001 |  |  |  |  |  |  |
| **Bench Trial** |  |  |  |  |  |  |
| Jury Waiver Signed |  |  |  |  |  | 9 |
| Opening Statement |  |  |  |  |  |  |
|  | Mr. Lerner (State) |  |  |  |  | 11 |
| State Witnesses |  |  |  |  |  |  |
|  | Jennifer Alexander | 13 | 28 | 46 |  |  |
|  | Richard Alexander | 48 | 61 | 73 |  |  |
|  | Mary Conlon | 74 | 76 | 78 |  |  |
|  | Off. Lambeseder | 79 | 88 | 102 |  |  |
|  | Off. Firth | 104 |  |  |  |  |
| State Rests |  |  |  |  |  | 108 |
| Defense Witnesses |  |  |  |  |  |  |
|  | Ralph Metz | 108 | 111 | 113 |  |  |
|  | Mary Kogut | 114 | 117 |  |  |  |
|  | Off. Lambeseder | 118 | 121 |  |  |  |
|  | Robert Miller | 123 | 133 | 144 |  |  |
| Stipulation |  |  |  |  |  | 144 |
|  | Carlos Mitchem | 145 |  |  |  |  |
| Defense Rests |  |  |  |  |  | 148 |
| State Witness |  |  |  |  |  |  |
|  | Off. Mitchem | 148 | 149 |  |  |  |
| Stipulation |  |  |  |  |  | 150 |

A-2

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|

State Rests 150

Closing Arguments

Mr. Goodman (Defense) 157

Mr. Lerner (State) 165

Finding of Guilt 171

Motion for New Trial - Denied 241

Sentencing Hearing

Argument in Aggravation 242

Argument in Mitigation 243

Allocution 245

Imposition of Sentence 249

v.

ROBERT MILLER

**Defendant**

NO. _____

I. R. # _____

S. I. D. # _____

## ORDER OF SENTENCE AND COMMITMENT TO
## ILLINOIS DEPARTMENT OF CORRECTIONS

The defendant having been adjudged guilty of committing the offense(s) enumerated below,

IT IS ORDERED that the defendant _____ROBERT MILLER_____ be and is hereby

sentenced to the ILLINOIS DEPARTMENT OF CORRECTIONS AS FOLLOWS:

_____18 YRS IDOC_____

_____CREDIT 502 DAYS_____

| | | Statutory Citation |
|---|---|---|
| Offense _RES. BURGLARY_ | _720_ ILCS _5/ 19-3_ | |
| Offense _____ | _____ ILCS ____/____ | |
| Offense _____ | _____ ILCS ____/____ | |
| Offense _____ | _____ ILCS ____/____ | |

IT IS FURTHER ORDERED that the Clerk of the Court shall deliver a copy of this order to the Sheriff of Cook County

IT IS FURTHER ORDERED that the Sheriff of Cook County shall take the defendant into custody and deliver him/her to the Illinois Department of Corrections.

IT IS FURTHER ORDERED that the Illinois Department of Corrections shall take the defendant into custody and confine him/her in the manner provided by law until the above sentence is fulfilled.

PREPARED BY

_____

**DEPUTY CLERK**

_____2-22-02_____

**BRANCH COURT**          **DATE**

ENTER: _Marcia B. Orr_ _203_

**JUDGE**          **JUDGE'S NO.**

A-4

_____ CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1. FILE RECORD-COURT CLERK WILL ATTACH TO FILE.          CCG·/805· 3/17/97–150M(83420244)

TO THE APPELLATE COURT OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
) No. 00 C2 20576
vs )  Trial Judge MARCIA ORR
Robert Miller )  Attorney
)  ASSISTANT PUBLIC DEFENDER

FILED '02 FEB 22 PM 12:58 DOROTHY BROWN CLERK OF CIRCUIT COURT SECOND DISTRICT

**NOTICE OF APPEAL**
An Appeal is taken from the order or judgment described below.
APPELLANT'S NAME: Robert Miller
IR#              D.O.B. August 9, 1956
APPELLANT'S ADDRESS: CCDOC / IDOC
APPELLANT'S ATTORNEY: State Appellate Defender
ADDRESS: 100 W. Randolph, Chicago, IL 60601
OFFENSE: Residential Burglary/Possession of Burglary Tools
JUDGMENT: Guilty
DATE: June 15, 2001
SENTENCE: 18 years Illinois Dept.
    of Corrections  David McPherson (Counsel)
                    APPELLANT
**VERIFIED PETITION FOR REPORT OF PROCEEDINGS**
COMMON LAW RECORD AND FOR APPOINTMENT OF COUNSEL ON APPEAL
Under Supreme Court Rules 605-608, appellant asks the Court to order
the Official Court Reporter to transcribe an original and copy of the
proceedings, file the original with the Clerk and deliver a copy to
the appellant; order the Clerk to prepare the Record on Appeal and to
Appoint Counsel on Appeal. Appellant, being duly sworn, says that at
the time of his conviction he was and is now unable to pay for the
Record or an appeal lawyer.

            David McPherson (Counsel)
            APPELLANT
SUBSCRIBED and SWORN TO THIS____DAY OF_____20____

                NOTARY PUBLIC
                ORDER
IT IS ORDERED the State Appellate Defender be appointed as counsel on
appeal and the Record and Report of Proceedings be furnished appellant
without cost. Dates to be transcribed:

PRE-TRIAL MOTION DATE (S)_____
JURY WAVIER DATE___June 14, 2001_
TRIAL DATE (s)___June 14, 2001 through June 15, 2001_
SENTENCING DATE (s)___February 22, 2002_

DATE:____2-22-02_____     ENTER:__Marcia B. Orr 203__
                                        JUDGE

A-5

NO. 1-02-0504

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

                              Plaintiff-Appellee,

                    vs.

ROBERT MILLER,

                              Defendant-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **MARCIA B. ORR,** Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

---

                    RICHARD A. DEVINE,
                      State's Attorney,
                      County of Cook,
                      Room 309 - Richard J. Daley Center,
                      Chicago, Illinois 60602

                    <u>Attorney for Plaintiff-Appellee</u>

RENEE GOLDFARB,
CHRISTINE COOK,
Assistant State's Attorneys,
     <u>Of Counsel.</u>*

---

    * **THERESA COPELAND,** a first year law student at University of New Mexico and a law clerk in the Criminal Appeals Division of the Cook County State's Attorney's Office, assisted in the research and preparation of this brief.

EXHIBIT B

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

$\qquad$ Plaintiff-Appellee,

vs.

ROBERT MILLER,

$\qquad$ Defendant-Appellant.

## POINTS AND AUTHORITIES

### I.

**THE EVIDENCE WHEN VIEWED IN A LIGHT MOST FAVORABLE TO THE PROSECUTION ESTABLISHED DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT** ........................................................ 13

Jackson v. Virginia, 443 U.S. 306,
  99 S.Ct. 2781 (1979)........................................................... 13

People v. Collins, 106 Ill. 2d 237,
  478 N.E.2d 267 (1985) ....................................................... 13

People v. Negron, 297 Ill. App. 3d 519,
  697 N.E.2d 337 (1st. Dist. 1998)........................................ 16,18,19

People v. Sutton, 252 Ill. App. 3d 172,
  624 N.E.2d 1189 (1st. Dist. 1993)...................................... 16

People v. Johnson, 114 Ill.2d 170,
  499 N.E.2d 1355 (1986) ..................................................... 16

People v. Pietruszynski, 189 Ill. App. 3d 1071,
  545 N.E.2d 942 (1st. Dist. 1989)....................................... 16,17

Neil v. Biggers, 409 U.S. 188,
    93 S.Ct. 375 (1972)............................................................................ 17

People v. Lewis, 165 Ill.2d 305,
    651 N.E.2d 72 (1995) ..................................................................... 17

People v. Herrett, 137 Ill.2d 195,
    561 N.E.2d 1 (1990) ...................................................................... 18,19

People v. Moore, 264 Ill. App. 3d 901,
    637 N.E.2d 1115 (1st. Dist. 1994)..................................................... 18

People v. McKinley, 69 Ill.2d 145,
    370 N.E.2d 1140 (1977) .................................................................. 19

People v. Bey, 51 Ill.2d 262,
    281 N.E.2d 638 (1972) .................................................................... 19

People v. Higgins, 50 Ill. 2d 221,
    278 N.E.2d 68 (1972) ...................................................................... 19

People v. Elam, 50 Ill.2d 214,
    278 N.E.2d 76 (1972) ..................................................................... 19,20

## II.

**THE TRIAL COURT DID NOT ABUSE ITS DESCRETION WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL ON THE GROUNDS THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL**........................................... **22**

People v. Abdullah, 2002 Ill. App. Lexis 1177, (4th Dist. 2002).................. 22

Strickland v. Washington, 466 U.S. 668,
    104 S. Ct. 2052 (1984)....................................................................... 22-25

People v. Albanese, 104 Ill. 2d 504,
    473 N.E.2d 1246 (1984) ................................................................... 22

People v. Palmer, 162 Ill. 2d 465,
    643 N.E.2d 797 (1994) ..................................................................... 22

People v. Odle, 151 Ill.2d 168,
    601 N.E.2d 732 (1992) ..................................................................... 22

People v. Bryant, 128 Ill.2d 448,
458, N.E.2d 1221 (1989) .......................................................... 22

People v. McKinley, 69 Ill.2d 145,
370 N.E.2d 1140 (1977) .......................................................... 23

People v. Bey, 51 Ill.2d 262,
281 N.E.2d 638 (1972) .......................................................... 23

People v. Higgins, 50 Ill. 2d 221,
278 N.E.2d 68 (1972) .......................................................... 23

People v. Elam (1972), 50 Ill.2d 214,
278 N.E.2d 76 (1972) .......................................................... 23

People v. Kinzer, 214 Ill. App. 3d 790,
574 N.E.2d 155 (1st. Dist. 1991) .......................................... 23

Neil v. Biggers, 409 U.S. 188,
93 S.Ct. 375 (1972).......................................................... 24,25

### III.

**THE TRIAL COURT PROPERLY IMPOSED A
SENTENCE FOR A CLASS X FELONY AND
SENTENCE WAS NOT A VIOLATION OF
APPRENDI V. NEW JERSEY**........................................... **26**

Apprendi v. New Jersey, 530 U.S. 466,
120 S. Ct. 2348 (2000)........................................................ 26-29

People v. Reed, 177 Ill.2d 389,
686 N.E.2d 584 (1997) .......................................................... 26

Almendarez-Torres v. United States, 523 U.S. 224,
118 S.Ct. 1219 (1998)........................................................ 27,28

Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533,
103 S. Ct. 1343,75 L. Ed. 2d 260 (1983)............................ 27

Hutto v. Davis, 454 U.S. 370, 102 S. Ct. 703,
70 L. Ed. 2d 556 (1982).................................................... 27

People v. Lathon, 317 Ill. App. 3d 573,
740 N.E.2d 377 (1st Dist. 2000)........................................ 27

People v. Ramos, 318 Ill. App. 3d 181,
742 N.E.2d 763 (1st Dist. 2000) ......................................................... 28

People v. Roberts, 318 Ill. App. 3d 719,
743 N.E.2d 1025 (1st Dist. 2000) ...................................................... 28

People v. Smith, 2003 Ill. App. LEXIS 482 at *13-14
(No. 1-01-4468 April 18, 2003) ......................................................... 28

People v. Jones, 322 Ill. App. 3d 236,
749 N.E.2d 466 (3d Dist. 2001) ......................................................... 28

People v. Dunn, 326 Ill. App. 3d 281,
760 N.E.2d 511 (1st Dist. 2001) ........................................................ 28

People v. Robinson, 167 Ill. 2d 53,
656 N.E.2d 1090 (1995) .................................................................... 28,29

People v. Wagener, 196 Ill. 2d 269,
752 N.E.2d 430 (2001) ...................................................................... 29

Daley v. Joyce, 126 Ill. 2d 209,
533 N.E.2d 873 (1988) ...................................................................... 29

People v. Williams, 149 Ill. 2d 467,
599 N.E.2d 913 (1992) ...................................................................... 29

People v. Adkins, 41 Ill. 2d 297,
242 N.E.2d 258 (1968) ...................................................................... 29

In re Winship, 397 U.S. 358,
90 S.Ct. 1068 (1970).......................................................................... 29

McMillan v. Pennsylvania, 477 U.S. 79,
106 S.Ct. 2411 (1986)........................................................................ 29

People v. Jackson, 149 Ill.2d 540,
599 N.E.2d 926 (1992) ...................................................................... 29

People v. Pittman, 326 Ill. App. 3d 297,
761 N.E.2d 171 (1st Dist. 2001) ........................................................ 29

730 ILCS 5-8-1(c) (1994) ...................................................................... 26

## IV.

## DEFENDANT'S FAILURE TO OBJECT TO TRIAL COURT'S ADMONISHMENTS AND FAILURE TO

**RAISE THE ISSUE IN THE WRITTEN MONTION
FOR A NEW TRIAL CONSTITUTES WAIVER OF
THAT ISSUE AND THE PLAIN ERROR
DOCTRINE IS NOT APPLICABLE** ............................... **31**

People v. Lloyd, 2003 Ill. App. LEXIS 461,
    788 N.E.2d 1169 (1st Dist. 2003) ....................................................... 31

People v. Reed, 282 Ill. App. 3d 278,
    280 (1st Dist. 1996) .............................................................................. 31

People v. Anderson, 266 Ill. App. 3d 947,
    641 N.E.2d 591 (1st Dist. 1994) ......................................................... 32

People v. Anderson, 309 Ill. App. 3d 417,
    722 N.E.2d 244 (4th Dist. 1999)......................................................... 32

People v. Davis, 145 Ill. 2d 240,
    582 N.E.2d 714 (1991) ........................................................................ 32

People v. Mazar, 333 Ill. App. 3d 244,
    775 N.E.2d 135 (1st Dist. 2002) ......................................................... 33

## V.

**THE MITTIMUS MUST ACCURATELY REFLECT
THE TIME DEFENDANT SPENT IN CUSTODY
PRIOR TO JUDGMENT** ................................................. **34**

People v. Fomond, 273, Ill. App. 3d 1053,
    652 N.E.2d 1322 (1st Dist. 1995)....................................................... 34

## ISSUES PRESENTED FOR REVIEW

Whether evidence when viewed in light most favorable to the prosecution established defendant's guilt beyond a reasonable doubt.

Whether the trial court abused its discretion when it denied defendant's motion for a new trial on the grounds he had been denied effective assistance of counsel.

Whether the trial court properly imposed a mandatory Class X sentence based on defendant's extensive criminal background which included at least two prior convictions for Class 2 or greater felonies

Whether defendant waived the right to challenge the admonishments he received at his sentencing hearing by failing to object at trial and failing to raise the issue in a written motion.

Whether the mittimus must be corrected to reflect that defendant spend 503 days in pre-sentence custody.

## STATEMENT OF FACTS

At 5:30 pm on October 8, 2000, Mrs. Jennifer Alexander and her husband Richard Alexander were in their home at 2201 Sherman Ave. in Evanston, when Mrs. Alexander noticed movement on her neighbors' back porch. (R. 16-17) The Alexanders were looking after their neighbors' home, 2205 Sherman, while their neighbors, Chip Plumb and Mary Kay Conlon, were out of town. (R. 15) Mrs. Alexander and her husband walked next door to determine who was in their neighbor's home. They let themselves on to the back porch using the key the neighbors had given them. (R. 17) Once on the porch, Mrs. Alexander noticed that a small wicker table was askew and that a hole, large enough for a person to crawl through,

had been cut into the porch's screen. (R. 17-18) The window in front of the screen looked like it had been pulled back, and the door leading from the porch into the house was ajar. (R. 52)

Noting the porch's disturbed condition, Mrs. Alexander, called out hello, and began to back out of the porch. When there was no response, Mrs. Alexander shouted that she was going to call the police. (R. 19-20) As Mrs. Alexander backed out of the porch, she saw a man come running out of the house, screaming and waiving his hands. Seeing this man, later identified as defendant Robert Miller, Mrs. Alexander stumbled down the stairs. She watched as defendant ran past her, and headed toward a bicycle that was parked by the side of the house beneath the torn screen. (R. 21-22) Defendant was two feet away from Mrs. Alexander when he passed her. (R. 21) Mrs. Alexander noted that defendant was in his forties, (R. 25) wearing dark clothes and a dark knit stocking cap. (R. 22)

Thinking that this screaming man had pushed his wife down, Mr. Alexander pursued him. (R. 55) Mr. Alexander followed defendant as he retrieved his bicycle from the side of the house. Defendant came out from the side of his house walking his bicycle; as he attempted to go through the gate on the side of the house, his bike got caught. (R. 55-56) Mr. Alexander leapt toward defendant and tripped over the bicycle. (R. 57) Defendant was propelled backwards to the ground. (R. 57) Defendant paused, facing Mr. Alexander, before he got up and began running from the side of the house to the street. Mr. Alexander watched as defendant headed, on foot, south on the sidewalk of Sherman Ave. and then turn west onto Garfield through a front yard. (R. 58) Defendant left behind his bicycle and the knit hat he had been wearing.

After watching defendant exit the front porch, run to the side of the house, retrieve his bike, struggle with him, and watch him run away down the street, Mr. Alexander described

defendant as smaller than himself, approximately thirty-seven years old, dressed in a black coat, jeans that were black in nature, and a wool stocking cap. (R.54)  Mr. Alexander testified that at 5:30 pm on October 8, 2000 it was still light out. (R. 49)

Mr. and Mrs. Alexander went into the neighbors' house to call 911 and inform police that a burglary had taken place. (R. 25)  Minutes later, at approximately 5:35 pm, Officer Lambeseder, who was on patrol in the area of the burglary, responded to a radio message for a burglary in progress that described the subject as a black male, short, wearing dark clothing, heading west from 2205 Sherman. (R. 80-81)  Officer Lambeseder responded to the message and drove around to the area where the subject might be running.  While he was driving, Officer Lambeseder received another radio message informing him that a subject matching the description given was continuing to run westbound around Maple which was between Officer Lambeseder and the location of the burglary. (R. 81-82)  Officer Lambeseder attempted to cut off the subject by parking on the street at 2100 Ridge.  While sitting in his parked squad car, Officer Lambeseder observed a short, black man, wearing dark clothing, sprinting out from between buildings. (R. 91)  Officer Lambeseder testified that when the subject saw his squad car he stopped running and began to walk. (R. 85)

Officer Lambeseder radioed to other officers that he had a subject that fit the description of the burglar and that he was going to stop the subject. (R. 85)  Officer Lambeseder approached the subject, whom he later identified as defendant Robert Miller, and informed him that he matched the description of the individual who had committed a burglary in the area.  Defendant didn't resist arrest.  Officer Lambeseder placed defendant in handcuffs and patted him down. (R. 87)  In his pockets, defendant was carrying a pry bar, and two Swiss

Army knifes. (R. 87) After patting down defendant, Officer Lambeseder placed him in the squad car and proceeded to the location of the burglary for identification purposes. (R. 88)

When Officer Lambeseder arrived at 2205 Sherman Ave. Officer Firth, another officer investigating the burglary, was already at the house. Officer Firth testified at trial that he saw the porch screen had been cut and he observed pry marks on the open window. (R. 107) Officer Firth was inside of the house with Mr. and Mrs. Alexander when Officer Lambeseder escorted defendant out of the squad car for identification purposes. Mr. and Mrs. Alexander stood on the enclosed porch to view the defendant who was standing outside, near the street, less than 60 feet away. (R. 97-100) Mr. and Mrs. Alexander both positively identified defendant as the man who came out of their neighbor's home. (R 101) Mrs. Alexander testified that she had ample opportunity to identify defendant while standing on the porch and that she was sure defendant was the man she had seen coming out of the Conlon's home. (R. 47) Mr. Alexander testified that he identified defendant because defendant was the person he saw at the Conlon's house and that he had not dissucussed defendant's identification with his wife. (R. 71)

One of the owners of the home, Mary Conlon, testified that she was informed of the burglary while she was still away and that when she returned home she found her bedroom in disarray, and the drawers of her dresser had been removed and their contents emptied onto her bed. (R. 74-75) She also discovered a duffle bag, belonging to her husband, on the stairs. It had been filled with items taken from her dresser, including a jewelry box. (R. 79) Mrs. Conlon looked through her house, but she could not identify any property that had been taken. (R. 78)

9

Throughout trial, defendant continued to assert his innocence. However, the parties stipulated, for the purpose of credibility, that defendant was convicted of Residential Burglary in 1992, and again in 1997, and in 1990 defendant was convicted of Felony Theft. (R. 150)

Defendant claimed that he had been salvaging for discarded items when he was arrested by Officer Lambeseder. Defendant alleged that on October 8, 2000, he had been working, doing carpentry, for Velma Thomas at 1310 Foster St. in Evanston. (R. 124) At 5:00 pm, he left work and headed to the el train on Foster Street. (R. 124) On the way to the train, defendant took a detour in order to look for discarded items. Defendant claimed to have found a roll of carpet that he wanted to lay down in Ms. Thomas' home. He started to make his way back to work to see if he could get a ride to bring the carpet to Ms. Thomas' house. (R. 126) On his way back defendant stopped on Ridge Ave. and lit a cigarette while waiting for traffic to clear. (R. 135) As defendant proceeded to cross Ridge Ave. Officer Lambeseder stopped him and detained him. Defendant asserted that he was handcuffed and remained in custody on Ridge Ave. for five to ten minutes. (R. 128) Defendant acknowledge that he was patted down by Officer Lambeseder, but he asserts that he used the pry bar recovered by Officer Lambeseder for pulling up flooring while working as a carpenter. He also claimed that the two Swiss Army knives had been given to him as gifts by Ms. Thomas. (R. 124)

Defendant was placed in Officer Lambeseder's squad car. Defendant claims that while he was in the squad car, an officer that had been at the scene of the burglary put a hat on him saying "Here's the hat you lost at the scene." (R. 128) Defendant asserts that he tried, but was unable to remove the hat from his head. Defendant claims that the hat was on his head when he rode in the squad car to 2205 Sherman Ave. Defendant testified that when he arrived at 2205 Sherman he sat in the squad car for about fifteen minutes while some officers went

10

inside the house. (R. 129)  Defendant said that he was still wearing the hat when a police officer took him out of the squad car and turned him around to face some houses.  Defendant did not see anyone inside when he was standing in the street facing the houses. (R. 129)

Defendant was then taken to the Evanston Police Station where he spoke with Detective Michem. (R. 131-132)  During his conversation with Detective Michem, defendant maintained that he did not burglarize the Conlon home and that the hat and bike recovered at the scene did not belong to him.  Defendant told Detective Michem that his bike was back at Ms. Thomas' home, 1301 Foster. (R.132)

While Detective Michem was able to confirm that a bike was chained to Ms. Thomas' gate, (R. 147) other aspects of defendant's story were not corroborated.  Officer Lambeseder testified that defendant was not wearing a hat when he was identified by Mr. and Mrs. Alexander. (R. 103)  Additionally, Mr. and Mrs. Alexander both testified that defendant was not wearing a hat when they identified him. (R. 27, 68)

The trial court determined that the defendant's case hinged on a question of credibility. (R. 169)  The court concluded that the route taken by defendant was not a reasonable route for somebody who was attempting to get a ride after finding a carpet. (R. 170)  After putting everything together, and weighing the credibility of the witnesses for defendant and the People, the court found defendant guilty of both Residential Burglary and Possession of Burglary Tools. (R. 171)

Subsequently, defendant was appointed new, private counsel and filed a Motion for a New Trial. (R. 196, 206)  After listening to defendant's argument in favor of a new trial, the court denied defendant's motion and held a sentencing hearing. (R. 235, 241)  Defendant was

11

sentenced to eighteen years in Illinois Department of Corrections, and the court advised defendant of his right to pursue an appeal. (R. 249-251)

## ARGUMENTS

### I.

**THE EVIDENCE WHEN VIEWED IN A LIGHT MOST FAVORABLE TO THE PROSECUTION ESTABLISHED DEFENDANT'S GUILT OF BURGLARY BEYOND A REASONABLE DOUBT.**

Defendant alleges that "because the identification of (defendant) was vague and doubtful, the state failed to prove (defendant's) guilt of Residential Burglary and Possession of Burglary Tools beyond a reasonable doubt." (Def's Br. p. 13) Defendant's complaints, however constitute a distortion of the record and ignore the evidence elicited at trial establishing defendant's guilt. The incriminating evidence includes the circumstances surrounding defendant's arrest, and the unwavering positive identification of defendant by two witnesses that had a full opportunity to see him during the burglary and identified him in a police showup less than an hour later.

A reviewing court must not ask whether it believes that the evidence at trial establishes guilt beyond a reasonable doubt, but rather "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 306, 319, 99 S.Ct. 2781 (1979), (see, People v. Collins, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985), Illinois adopts the Jackson holding).

An examination of the record reveals that, contrary to defendants brief, the identifications of defendant were neither vague nor doubtful and the witnesses had substantial opportunities to view him. At 5:30 pm on October 8, 2000, Mrs. Jennifer Alexander and her husband Richard Alexander were in their home at 2201 Sherman Ave. in Evanston, when Mrs. Alexander noticed movement on her neighbor's back porch. (R. 17) The Alexanders were

13

assisting their neighbors, who were out of town, by watching their house. (R. 15)  Upon noticing the movement, Mrs. Alexander and her husband proceeded next door to 2205 Sherman in order to determine if anyone was present at their neighbor's home.  They let themselves on to the back porch with the key their neighbors had given them. (R. 17)  Once on the porch, Mrs. Alexander noticed that a small wicker table was askew and that a hole, large enough for a person to crawl through, had been cut into the porch's screen. (R. 18)  The window in front of the screen looked like it had been pulled back, and the door leading from the porch into the house was ajar. (R. 52)

Noting the disturbed condition of the porch, Mrs. Alexander, called out hello, and began to back out of the porch.  When there was no response, Mrs. Alexander shouted that she was going to call the police. (R. 19-20)  As Mrs. Alexander backed out of the porch, she saw a man come running out of the house, screaming and waiving his hands.  Seeing this man, later identified as defendant Robert Miller, Mrs. Alexander stumbled down the stairs.  She watched as defendant ran past her, and headed toward a bicycle that was parked by the side of the house beneath the torn screen. (R. 21-22)

In contrast to defendant's statement in his brief that Mrs. Alexander "did not have a good opportunity to view the offender," (Def. Br. p. 19) defendant was two feet away from Mrs. Alexander when he ran past her. (R. 21)  Mrs. Alexander was able to see defendant's face as he passed her. (R. 24)  Her description of defendant was not vague, as she stated that he was in his forties, (R. 25) wearing dark clothes, and a dark knit stocking cap. (R. 22)  This shows Mrs. Alexander's heightened sense of awareness.

In addition to Mrs. Alexander's accurate and detailed description, Mr. Alexander also had a significant interaction with defendant that allowed him to describe and recognize

14

defendant. Thinking that defendant had pushed his wife down, Mr. Alexander pursued him. (R. 55) Mr. Alexander followed defendant as he retrieved his bicycle from the side of the house. Defendant came out from the side of the house walking his bicycle. (R. 56) As defendant attempted to go through the gate on the side of the house, his bike got caught. (R. 55-56) Mr. Alexander leapt toward defendant and tripped over the bicycle. (R. 57) Defendant was propelled backwards to the ground. (R. 57) Defendant paused, facing Mr. Alexander, before he got up and began running from the side of the house to the street. Mr. Alexander watched as defendant headed south down the sidewalk on Sherman Ave. and then turn west onto Garfield through a front yard. (R. 58) Defendant left behind his bicycle and the knit hat he had been wearing.

Mr. and Mrs. Alexander went into the neighbor's house to call 911 and inform them that a burglary had taken place. (R. 25) The description the Alexanders gave to police was of a short, black male, wearing dark clothing. (R. 81) Contrary to defendant's brief, the description was not vague and unreliable, (Def's Br. p. 13) as it assisted Officer Lambeseder, who was on patrol in the area, in apprehending defendant just minutes after the burglary. In an attempt to cut off defendant, Officer Lambeseder was sitting in his parked squad car. Less than fifteen minutes after he received the radio message about the burglary, Officer Lambeseder observed defendant who matched description provided—a short, black man, wearing dark clothing— sprinting from an alley. (R. 91) Officer Lambeseder testified that when this man saw his parked squad car he stopped running and began to walk. (R. 85) This incriminating behavior coupled with the fact that defendant matched the description given to police by the Alexanders prompted Officer Lambeseder to radio other officers that he was going to stop the subject. (R. 85) Officer Lambeseder approached the subject, whom he later identified as defendant, placed

15

defendant in handcuffs, and patted him down. (R. 87)  In his pockets, defendant was carrying a

pry bar, and two Swiss Army knifes. (R. 87)  While defendant claimed at trial and again in his

brief that the tools recovered by Officer Lambeseder had an innocent purpose, (Def. Br. p. 19)

the trial court rejected defendant's claim acknowledging that the tools "could have been used in

(the) burglary." (R. 171)

After patting down defendant, Officer Lambeseder placed him in his squad car and

proceeded to the location of the burglary for identification purposes. (R. 88)  When Officer

Lambeseder arrived at 2205 Sherman Ave. Officer Firth, another officer investigating the

burglary, was already at the scene of the burglary.  Officer Firth testified that he saw the porch

screen had been cut and he observed pry marks on the open window. (R. 107)  Officer Firth

was inside of the house with Mr. and Mrs. Alexander when they stood on the enclosed porch to

view defendant Miller who was standing outside, near the street. (R. 97-100)  Mr. and Mrs.

Alexander both positively identified defendant as the man who came out of the their neighbor's

home. (R. 101)  Mrs. Alexander testified that she had ample opportunity to identify defendant

while standing on the porch and that she was sure defendant was the man she had seen coming

out of the Conlon's home. (R. 47)  Mr. Alexander testified that he identified defendant because

defendant was the person he saw at the Conlon's house and that he had not discussed

defendant's identification with his wife. (R. 71)

Defendant's call for a reversal of his conviction ignores the established rule that this

Court ought not substitute its judgment for that of the trier of fact on questions involving

witness credibility.  People v. Negron, 297 Ill. App. 3d 519, 529, 697 N.E.2d 337 (1st. Dist.

1998), People v. Sutton, 252 Ill. App. 3d 172, 180, 624 N.E.2d 1189 (1st. Dist. 1993), People v.

Johnson, 114 Ill.2d 170, 189-190, 499 N.E.2d 1355 (1986), and People v. Pietruszynski, 189

Ill. App. 3d 1071, 1076-77, 545 N.E.2d 942 (1st. Dist. 1989). Additionally, when viewed in light, most favorable to the prosecution, the identification of defendant by Mr. and Mrs. Alexander more than satisfies the factors that are to be considered in evaluating the reliability of identification testimony. Those factors include (1) the opportunity the witness had to view the offender at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the offender, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the length of time between the crime and the first identification. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375 (1972), People v. Lewis, 165 Ill.2d 305, 356, 651 N.E.2d 72 (1995). An examination of each factor demonstrates that the witnesses in this case were in fact very credible.

Beginning with the first two factors, the opportunity the witnesses had to view defendant at the time of the burglary and their degree of attention, the record amply supports the inference that both Mr. and Mrs. Alexander's attention was squarely fixed on defendant as he attempted to exit the porch and they had a more than adequate opportunity to view him. Mrs. Alexander testified that defendant was two feet from her face as he ran past her and she watched defendant struggle with her husband and flee down the street. (R. 21-22, 24) Additionally, Mr. Alexander's encounter with defendant was more significant. He saw defendant exit the porch and followed him around to the side of the house. Mr. Alexander approached defendant as he retrieved his bicycle and Mr. Alexander struggled with him. (R. 55-56) Although Mr. Alexander testified that his encounter with defendant only lasted seconds, the trial court concluded that it could easily have taken longer. The court stated that "actually seconds are pretty fast for what (Mr. Alexander) described. It could have been a few minutes. His testimony is just an estimate." (R. 169) Additionally, neither Mr. Alexander's

17

nor Mrs. Alexander's view was hindered by lighting conditions. Mr. Alexander testified that at 5:30 pm on October 8 it was still light out. (R. 49)

The mitigating factors listed by defendant in his brief, including the "brief opportunity to view the offenders...while (Mr. and Mrs. Alexander) were both frightened and distracted by the chaotic events taking place," are not supported by evidence and do not call for the conclusion that the identification of defendant was "so fraught with doubt as to raise a reasonable doubt as to defendant's guilt." People v. Negron, 297 Ill. App. 3d 519, 531, 697 N.E.2d 329 (1st.Dist. 1998). Identifications have been upheld in cases where witnesses had significantly less opportunity to view the offender than the Alexanders in this case. For example, in People v. Herrett, 137 Ill.2d 195, 561 N.E.2d 1 (1990), the defendant's conviction was upheld when the eyewitness only had the opportunity to view his assailant for a "few seconds" in a dimly lit room before his eyes were covered with duct tape. Similarly in People v. Moore, 264 Ill. App. 3d 901, 911, 637 N.E.2d 1115 (1st. Dist. 1994), the identification of the defendant was determined to be reliable despite the fact that the two eyewitnesses, one of whom had been drinking, observed defendant for a only "few seconds" from a dark viaduct.

When the opportunity to view the defendant and degree of attention of the Alexanders is compared with that of the witnesses in Herrett and Moore, it is clear that their identification was reliable. Unlike the witnesses in Herrett and Moore, the Alexanders had more than just a few seconds to view defendant and their vision was not hindered by poor lighting. Further, their heightened sense of alert is shown by the details provided.

The third factor to be considered in evaluating the reliability of identification testimony, the accuracy of the witness' description of defendant, also supports defendant's conviction. The Alexanders' description of defendant, although not overly detailed was accurate. The

Alexanders correctly described defendant as a black man, about forty years old, shorter than Mr. Alexander who is six feet tall, wearing dark clothing. (R. 54) This specific description of defendant, including an estimate of his age, height, and a report of what defendant was wearing is sufficient in light of People v. Herrett, 137 Ill.2d 195, 561 N.E.2d 1 (1990), in which the court determined that a witness need not describe the offender with complete accuracy. Additionally in People v. Negron, 297 Ill. App. 3d 519, 530, discrepancies and omissions as to facial and other physical characteristics are not fatal to the a witness' identification testimony, but merely affect the weight to be given that testimony. Considering that the identification by Mr. and Mrs. Alexander was accurate and included precise physical characteristics of defendant, their testimony was properly given its considerable weight.

The next factor, the level of certainty displayed by the Alexanders at the time of identification, also supports upholding defendant's conviction. Both Mr. and Mrs. Alexander positively identified defendant. Mrs. Alexander went so far as to say it was "instant recognition." (R.45) Neither of them hesitated or wavered in their identification of defendant. Both testified that they were sure defendant was the person they saw on the porch of 2205 Sherman Ave only minutes after their encounter with defendant. (R. 47, 61)

While defendant contends that the lack of any uncertainty on the part of the Alexanders is discounted by the "suggestive nature of the identification procedure" (Def's Br. p. 18) the showup of a defendant immediately after arrest has been upheld by this Court in the past. Prompt showups near the scene of the crime are acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits. People v. McKinley, 69 Ill.2d 145, 370 N.E.2d 1140 (1977), People v. Bey, 51 Ill.2d 262, 281 N.E.2d 638 (1972), People v. Higgins, 50 Ill. 2d 221, 278 N.E.2d 68 (1972), People v. Elam, 50 Ill.2d

214, 278 N.E.2d 76 (1972).    In addition, defendant's contention that he was prejudiced because he was forced to wear the hat that was left at the scene (Def's Br. p. 17) was addressed at trial.  Both Officer Lambeseder and the Alexanders contradicted defendant's assertion.

Finally, the exceptionally brief delay between the crime and the identification by Mr. and Mrs. Alexander, weighs in favor of their credibility.  Less than an hour passed between the time of the burglary and the identification.  This brief delay, along with their correct and detailed description, as well as their positive identification, leads to the conclusion that their identification of defendant was reliable.

The five factors used to examine the credibility of a witness' identification only serve to strengthen the Alexanders' testimony and prove defendant guilty beyond a reasonable doubt.  It is also significant that Defense Counsel commented that the Alexanders "came off very well." (R. 160)

Additionally, the testimony of Mr. and Mrs. Alexander was not the only evidence presented by the People that established defendant's guilt.    Defendant was arrested after Officer Lambeseder witnessed him sprinting from in between two buildings, coming from the direction of the burglary. (R. 91)  The arrest was made less than fifteen minutes after the burglary and defendant was carrying tools that could have been used in the commission of the burglary, a Swiss army knife to cut the porch screen and a pry bar to pry open the window. (R. 87)  The incriminating circumstances surrounding the arrest, when combined with the credible identification by Mr. and Mrs. Alexander proved defendant guilty beyond a reasonable doubt.

Also, the trial court addressed defendant's innocent explanation for his presence in proximity to the scene of the burglary.  Although defendant testified that he "was on his way home from work and headed towards the el, when he spotted some junk in an alley," (Def's Br.

p. 19) the trial court described defendant's story as "incredible." (R. 240)  In finding defendant

guilty, the court stated:

> The other thing that I find hard to believe is that this person who is leaving a day's worth of work, according to his testimony, (to) take a train to the south side, suddenly decides, without any equipment to carry away, he just decides to start scavenging in an alley.  I think if one is really scavenging in an alley with some method of transportation or at least some sort of container, that makes more sense to maybe to carry out what they find. (R. 171)

This statement indicates that the trial court has weighed defendant's credibility and found his

explanation unbelievable.

The trial court also assessed defendant's chosen route noting that it was the shortest

escape route from the scene of the burglary.  Of defendant's route the court stated:

> The police say (defendant) was actually running through this private property. The place where defendant exited is right where he would come out if he were running from 2205 Simpson southbound onto Garfield, westbound, which is what Mr. Alexander testified, he would come out right in the middle of Maple there, have to go through these buildings and then out to Leonard or Leonard Place at Ridge.  That would be the shortest route for someone running from that scene.  It isn't a reasonable route for somebody who was somewhere in the alley, in an alley going to get a ride. (R. 170)

It is significant to note that aside from defendant's implausible explanations provided to the

trial court, his credibility is undermined by his two residential burglary convictions and a

felony theft conviction. (R. 150)

Defendant's argument on appeal ignores the standard of review and is an improper

request to be re-tried on appeal using a cold record in the hopes that this Court will make a

contrary credibility determination.  When viewed in a light most favorable to the prosecution,

the circumstances surrounding defendant's arrest, and the positive identification of defendant

by Mr. and Mrs. Alexander proved defendant guilty beyond a reasonable doubt.  This Court

should reject defendant's arguments and affirm his conviction.

21

## II.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.

Defendant asserts that the trial court erred when it failed to grant his Motion for a New Trial on the grounds that defense counsel's failure to file a Motion to Suppress Identification constituted ineffective assistance of counsel.

The standard of review for the granting or denial of a Motion for a New Trial is whether the trial court abused its discretion. People v. Abdullah, 2002 Ill. App. Lexis 1177, (4th Dist. 2002). Additionally, to prevail on a claim of ineffective assistance of counsel, defendant must prove both that his counsel fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), People v. Albanese, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246 (1984). A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. People v. Palmer, 162 Ill. 2d 465, 475-76, 643 N.E.2d 797 (1994).

Significantly, effective assistance of counsel in a constitutional sense means competent, not perfect representation. People v. Odle, 151 Ill.2d 168, 601 N.E.2d 732 (1992). Courts indulge in the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. Strickland, 466 U.S. at 690. Furthermore, the question of whether to file a Motion to Quash Arrest and Suppress Evidence is traditionally considered a matter of trial strategy and constitutes an area left to the discretionary judgment of trial counsel. People v. Bryant, 128 Ill.2d 448, 458, N.E.2d 1221 (1989). Because the decision to litigate a

22

motion to suppress evidence is usually a question of trial tactics it has no bearing on the issue of attorney competency.

Defendant's argument fails both prongs of the <u>Strickland</u> test. First, counsel's representation was objectively reasonable, and the result of the proceeding would not have been different had counsel filled a motion to suppress identification.

Under the first prong of the <u>Strickland</u> test, defense's counsel representation did not fall below an objective standard of reasonableness for failing to file a Motion to Suppress Identification because such a motion would have been frivolous. While defendant asserts that the identification of defendant was "the result of an unnecessarily suggestive showup," (Def's Br. p. 21) courts have consistently held that prompt showups near the scene of the crime as acceptable police procedure designed to aid police in determining whether to continue or to end the search for the culprits. <u>People v. McKinley</u>, 69 Ill.2d 145, 370 N.E.2d 1140 (1977), (<u>see also</u>, <u>People v. Bey</u>, 51 Ill.2d 262, 281 N.E.2d 638 (1972), <u>People v. Higgins</u>, 50 Ill. 2d 221, 278 N.E.2d 68 (1972), <u>People v. Elam</u> (1972), 50 Ill.2d 214, 278 N.E.2d 76 (1972)).

In the instant case, the identification of defendant took place less than an hour after the burglary of 2205 Sherman and less than ten minutes after defendant was apprehended by Officer Lambeseder who watched defendant sprint out of an alley. (R. 91) The circumstances of defendant's identification in this case are similar to the circumstances in <u>People v. Kinzer</u>, 214 Ill. App. 3d 790, 574 N.E.2d 155 (1st. Dist. 1991). In <u>Kinzer</u>, the court upheld the defendant's robbery conviction when he was tentatively identified by the victim while he was seated alone in a squad car at the crime scene, and then positively identified by the victim at the police station where defendant was placed alone in a well-lit room. <u>Kinzer</u>, 574 N.E.2d at 156. The affirmation of the defendant's conviction in <u>Kinzer</u> indicates that a Motion to Suppress

Identification in the instant case would have been frivolous. Because courts have consistently upheld convictions based on identifications of defendants during show ups, defense counsel in this case was not ineffective for choosing not to file a Motion to Suppress Identification.

Additionally, an examination of the complete trial record demonstrates that defendant's counsel was not ineffective. Defendant's attorney subjected the People's witnesses to vigorous cross-examination, made appropriate objections, and used police reports for the purpose of impeachment. The competence of defendant's counsel was assessed by the trial court during the Motion For a New Trial. Trial court stated

> The fact that some attorney would perhaps have…used a different set of trial tactics had he been trying the case does not mean that the trial tactics that were engaged in by the attorney who actually did try the case rise to the level of incompetence. And I think to the contrary here. The attorney who represented (defendant) did an excellent job. (R. 238-239)

Defense counsel was not ineffective, therefore ending the analysis under the Strickland test. However, if this Court were to find that defendant's counsel fell bellow a reasonable performance standard, the People contend that the alleged error does not satisfy the second prong of Strickland. Counsel's failure to file a Motion to Suppress Identification did not result in a different outcome, as such a motion would not have been successful. Contrary to defendant's brief, it is not likely that the identification of defendant by Mr. and Mrs. Alexander would have been suppressed. (Def's Br. p. 23)  When viewed under the totality of the circumstances, as required by Neil v. Biggers, 409 U.S. 188, 189, 93 S.Ct. 375 (1972), identification of defendant was indeed reliable.

Defendant is correct in his assertion that five factors are to be considered in evaluating the reliability of an identification including 1) the opportunity of the witness to view the offender at the time of the crime, 2) the witness' degree of attention, 3) the accuracy of the

24

witness' prior description of the offender 4) the level of certainty demonstrated by the witness at the confrontation, and 5) the length of time between the crime and the confrontation. Neil, 409 U.S. at 199-200. However, defendant's claim that when these factors are considered the reliability of the "identification evidence was close" (Def. Br. p. 31) ignores the circumstances surrounding his identification. (See Peoples Argument I)

While defendant continues to assert that his identification was unreliable because he was identified during a one man showup, courts have consistently found showups to be legitimate police procedure. As previously discussed, the fact that witnesses viewed defendant during a prompt show up does not necessitate that a Motion to Suppress Identification would have been granted. The trial court confirmed this view during the Hearing on defendant's Motion for a New Trial. The court stated:

> There is no basis to challenge the identification procedure. Show-ups immediately after the offense are accepted identification. There is no reason to hold a lineup, because the witnesses had already identified the defendant. So failure to make those pretrial motions jus is not incompetence of counsel. I think the motions would have been frivolous had they been made from what I now know of the case. (R. 239)

This statement by the trial court establishes that had defense counsel made a Motion to Suppress Identification, the outcome of the trial would not have been different; such a motion would have been denied.

Defendant's claim of ineffective assistance of counsel fails to meet either prong of the Strickland test. Defendant's counsel did not fall below an objective performance standard and the error alleged by defendant, failure to file a Motion to Suppress Identification, did not result in a different result at trial. Finally, the trial court did not abuse its discretion in denying defendant's Motion for a New Trial.

## III.

## THE TRIAL COURT PROPERLY IMPOSED A SENTENCE FOR A CLASS X FELONY AND SENTENCE WAS NOT A VIOLATION OF APPRENDI V. NEW JERSEY..........................................    \

Defendant contends that pursuant to the United States Supreme Court decision of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000) and the jury trial guarantee of the Illinois Constitution of 1970, his 18 year sentence for Residential Burglary is unconstitutional and asks this Honorable Court to remand the matter for imposition of a Class One sentence. Specifically, defendant maintains that the mandatory Class X offender sentencing provision found in section 5-5-3(c)(8) of the Unified Code of Corrections (730 ILCS 5/5-5-3(c)(8)) is unconstitutional because it requires a trial court to impose a Class X sentence even though the requisite factors were not proven to the trier of fact beyond a reasonable doubt.

In response, the People first maintain that defendant should not be permitted to raise this issue as he has never before challenged the imposition of a Class X sentence. Illinois law is clear that a defendant who wishes to challenge his sentence or any irregularities in the sentencing hearing must first file a timely post-sentencing motion in the trial court or the issue will be deemed waived. See 730 ILCS 5-8-1(c) (1994); People v. Reed, 177 Ill.2d 389, 686 N.E.2d 584 (1997). Accordingly, the People maintain that defendant's challenge to his sentence is waived and should be summarily rejected.

Moreover, the People point out that even if the issue had not been waived, defendant's argument is entirely without merit as Apprendi does not apply to recidivist provisions such as section 5-5-3(c)(8). In Apprendi, the Court held that the United States Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. 120 S.Ct. at 2362-63 (emphasis added). In excepting

26

recidivist statutes from this rule, the Apprendi majority noted that recidivism is a "'traditional if not the most traditional basis for a sentencing court's increasing an offender's sentence'" and that recidivism "'does not relate to the commission of the offense." Id. at 2361-62 (quoting Almendarez-Torres v. United States, 523 U.S. 224, 243-44, 118 S.Ct. 1219, 1230-31 (1998)). While it is true that the Apprendi majority stated that "it is arguable that Almendarez-Torres was incorrectly decided" (120 S.Ct. at 2362), the Court was clear that it was not overruling its prior decision.

Furthermore, "only [the Supreme Court] may overrule one of its precedents. Until that occurs [Almendarez-Torres] is the law." Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 103 S. Ct. 1343, 1344, 75 L. Ed. 2d 260 (1983). As the Court has recognized, "unless we wish anarchy to prevail within the federal judicial system, a precedent of this [C]ourt must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." Hutto v. Davis, 454 U.S. 370, 102 S. Ct. 703, 706, 70 L. Ed. 2d 556 (1982). Thus, since Almendarez-Torres was expressly not overruled by the Supreme Court in Apprendi, this Court is obligated to apply it in this case.

Similarly, in People v. Lathon, 317 Ill. App. 3d 573, 740 N.E.2d 377 (1st Dist. 2000), this Honorable Court expressly held that section 5-5-3(c)(8) comported with the constitution. The Lathon court stated:

> "a defendant's recidivism is a narrow exception to the general rule articulated in Apprendi that the federal Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in the charging document, submitted to a jury, and proved beyond a reasonable doubt. The reasons recognized by Apprendi for applying the recidivism exception exist in this case and mitigate constitutional concerns regarding defendant's due process rights and jury trial guarantees. Here, procedural safeguards enhanced the validity of the defendant's prior convictions. Moreover, the defendant's prior convictions were not an essential element of the underlying offense and were not related to the commission of the underlying offense. Consequently, we hold that the mandatory Class X sentencing provision of section 5-5-3(c)(8), which provides for sentencing enhancement based on prior convictions, is

27

> constitutional and does not violate defendant's due process rights
> or jury trial guarantees. Under this mandatory Class X sentencing
> provision, a defendant's sentence is properly increased when the
> trial judge concludes at the sentencing hearing that evidence of
> the prior two convictions is accurate, reliable and satisfies the
> section 5-5-3(c)(8) statutory factors. When a defendant's
> punishment is increased based on prior convictions, the prior
> convictions need not be alleged in the charging document,
> submitted to the jury or proven beyond a reasonable doubt
> because the prior convictions were obtained as the result of
> proceedings which provided procedural safeguards, the prior
> convictions were not an essential element of the underlying
> offense and the prior convictions were unrelated to the
> commission of the offense."

Id. at 587, 740 N.E.2d at 386-87 (citations omitted). See also People v. Ramos, 318 Ill. App. 3d 181, 193, 742 N.E.2d 763, 774 (1st Dist. 2000) (holding that section 5-5-3(c)(8) is constitutional because "Apprendi clearly exempts recidivist statutes") and People v. Roberts, 318 Ill. App. 3d 719, 729, 743 N.E.2d 1025, 1033 (1st Dist. 2000) ("Because Almendarez-Torres is still good law, we reject defendant's assertion that Apprendi renders [section 5-5-3(c)(8)] unconstitutional.") Thus, any assertion that Almendarez-Torres is no longer good law or that Apprendi applies to recidivist provisions must be soundly rejected.

Moreover, in regard to defendant's claim that section 5-5-3(c)(8) is not simply a recidivist provision since it also requires a particular sequence of the convictions and applies only to those defendants who are at least 21 years old, the People point out that this Honorable Court has repeatedly rejected such an argument because those factors are "sufficiently intertwined with recidivism and distinct from the elements of the underlying offense to fall under the recidivism exception recognized in Apprendi." People v. Smith, 2003 Ill. App. LEXIS 482 at *13-14 (No. 1-01-4468 April 18, 2003) (citing People v. Jones, 322 Ill. App. 3d 236, 243, 749 N.E.2d 466 (3d Dist. 2001); People v. Dunn, 326 Ill. App. 3d 281, 289, 760 N.E.2d 511 (1st Dist. 2001)).

As to defendant's assertions that the Illinois rule that the prior convictions need only be proven by a preponderance of the evidence (see People v. Robinson, 167 Ill. 2d 53, 656

N.E.2d 1090 (1995)) violates the holding of Apprendi, the People again point out that the United States Supreme Court expressly exempted recidivist statutes from the scope of its holding. 120 S.Ct. at 2362-63. Also, in People v. Wagener, 196 Ill. 2d 269, 752 N.E.2d 430 (2001), the Illinois Supreme Court clearly stated that Apprendi must be read narrowly and should not be "extend[ed] . . . to arenas which it did not purport to address, which indeed it specifically disavowed addressing, in order to find unconstitutional a law of this state. This is especially true where, as here, to do so would require us to overrule settled law in this state."Id. at 287.

Finally, although it is true that the Illinois constitutional right to a jury is broader than its federal counterpart (Daley v. Joyce, 126 Ill. 2d 209, 533 N.E.2d 873 (1988)), the Illinois Supreme Court has expressly recognized that prior convictions need not be proven beyond a reasonable doubt in order to impose an enhanced sentence. See People v. Williams, 149 Ill. 2d 467, 488-90, 599 N.E.2d 913 (1992). Rather, in Williams, our supreme court relied upon People v. Adkins, 41 Ill. 2d 297, 242 N.E.2d 258 (1968), which held that a defendant's due process rights under the Federal or the Illinois Constitution of 1870 are not implicated when a sentencing judge considers information which has not been subjected to trial-like standards. Similarly, the Williams court expressly rejected the defendants' arguments predicated upon In re Winship, 397 U.S. 358, 90 S.Ct. 1068 (1970) and instead looked to McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411 (1986) when it rejected the defendants' argument that "the severity of the punishment prescribed by the Class X provision requires a defendant's prior convictions be proven beyond a reasonable doubt." Williams, 149 Ill. 2d at 488-89. See also People v. Jackson, 149 Ill.2d 540, 599 N.E.2d 926 (1992) (citing McMillan and holding that a lower burden of proof is permissible at sentencing and finding no due process violation where the trial court considered in aggravation an offense for which the defendant had been acquitted).

Moreover, in People v. Pittman, 326 Ill. App. 3d 297, 761 N.E.2d 171 (1st Dist. 2001) and People v. Smith, 2003 Ill App. LEXIS 482 (No. 1-01-4468 April 18, 2003), this

Honorable Court held that the recidivist provisions of the Unified Code of Corrections do not violate the right to a jury under the Illinois Constitution of 1970.

Therefore, for all the foregoing reasons, the People respectfully request that this Honorable Court reject defendant's arguments and affirm his conviction and sentence.

IV.

**DEFENDANT'S FAILURE TO OBJECT TO THE TRIAL COURT'S ADMONISHMENTS AND FAILURE TO RAISE THE ISSUE IN THE WRITTEN MOTION FOR A NEW TRIAL CONSTITUTES WAIVER OF THAT ISSUE AND THE PLAIN ERROR DOCTRINE IS NOT APPLICABLE.**

Defendant contends that this cause must be remanded to the trial court because the admonishment given by the trial court after sentencing did not sufficiently comply with Supreme Court 605(a). (Def's Br. p. 10)

Defendant's claim should not be entertained by this Court because he failed to object to the admonishment given at trial and he did not object in a Post Trial Motion, therefore, defendant has waived this issue for the purpose of appeal. Normally, the standard of review regarding compliance with supreme court rules is de novo. People v. Lloyd, 2003 Ill. App. LEXIS 461, 788 N.E.2d 1169 (1st Dist. 2003).

It is well established that in order to preserve an issue for review, a defendant must make a contemporaneous objection and include the alleged error in a Post Trial Motion. By failing to do so, the issue is waived on appeal. People v. Reed, 282 Ill. App. 3d 278, 280 (1st Dist. 1996), affirmed in Reed, 177 Ill.2d 389, 686 N.E.2d 584 (1997). The purpose of this requirement is to allow the trial court the opportunity to correct errors immediately and to avoid the delay and expense that accompanies the appellate process. Reed, 282 Ill. 3d at 281.

However, the People recognize that the waiver doctrine is not absolute. According to Supreme Court Rule 615, if the issue raised constitutes a plain error or a defect affecting substantial rights it may be addressed by a reviewing court. 107 Ill. 2d R. 615. The party wishing to avoid waiver must establish that the trial court's error was substantial and resulted in

the denial of a fair trial or sentencing hearing. <u>People v. Anderson</u>, 266 Ill. App. 3d 947, 954, 641 N.E.2d 591 (1st Dist. 1994). When admonishing a defendant, the court need not use the exact language of a rule; the court must simply avoid misrepresenting or leaving out any of a rule's substance. <u>People v. Anderson</u>, 309 Ill. App. 3d 417, 421 722 N.E.2d 244 (4th Dist. 1999). Whether reversal is required for an imperfect admonishment depends on whether real justice has been denied or whether the defendant has been prejudiced by the inadequate admonishment. <u>People v. Davis</u>, 145 Ill. 2d 240, 250, 582 N.E.2d 714 (1991).

In the instant case, the admonishment received by defendant does not constitute plain error. While the trial court did not use the exact language of Rule 605(a)when admonishing defendant, defendant was substantially admonished when trial court state:

> Mr. Miller, let me advise you, if you wish to pursue an appeal here, you have that right. In order to start the appellate process, you must have a notice of appeal filed with the Clerk of the Circuit Court within the next 30 days.
> If you are indigent, you will have an appointed attorney given to you by the court system for purposes of pursuing the appeal. Do you understand this? (R. 250-251)

The court's deviation from the rule did not deny defendant a fair sentencing hearing, nor were defendant's rights substantially affected. The court, in admonishing defendant, instructed him that he had the right to appeal and that in order to do so, defendant had to first file within 30 days, a written notice of appeal. (R. 250-251) Defendant was also instructed that if he could not afford an attorney, an attorney would be appointed to represent him. (R. 251) While defendant is correct in his assertion that the trial court did not specifically mention the right to appeal his sentence, this oversight does not amount to plain error because the court stressed that notice of appeal was required for defendant to appeal. (R. 250-251) The trial court specifically stated that in order for defendant to appeal an aspect of the sentencing hearing, "the decision

32

here," he had to file a written notice of appeal within thirty days. (R. 251) It is obvious that the trial court referred to sentencing.

Finally, defendant is incorrect in his assertion that this case is comparable to People v. Mazar, 333 Ill. App. 3d 244, 775 N.E.2d 135 (1st Dist. 2002). In Mazar, the court held that fundamental fairness required that the defendant's case be remanded to the circuit court for further admonishments. However, the instant case is easily distinguished from Mazar, as the defendant in that case was pro se. While fundamental fairness may require a pro se defendant to be admonished more thoroughly, in this case, defendant was represented by counsel and the trial court's admonishments were sufficient to advise defendant of his rights.

This case need not be remanded for further admonishment because the defect alleged by defendant does not constitute plain error.

V.

## THE MITTIMUS MUST ACCURATELY REFLECT THE TIME DEFENDANT SPENT IN CUSTODY PRIOR TO JUDGMENT.

Defendant contends that the mittimus incorrectly shows 502 days of sentencing credit. (Def's Br. p. 12) Defendant asserts that the mittimus should reflect the fact that he served 503 days in jail prior to sentencing. The People agree that the mittimus must accurately reflect the time defendant spent in custody prior to judgment, however, this Court need not remand this matter to the trial court as it may correct the mittimus itself. People v. Fomond, 273, Ill. App. 3d 1053, 1068, 652 N.E.2d 1322, 1333 (1st Dist. 1995).

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's conviction and sentence.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1998) and relevant statutory provisions 725 ILCS 5/110-7(h)(2002); 55 ILCS 5/4-2002.1 (2002), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (2002), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
    State's Attorney,
    County of Cook,
    Room 309 - Richard J. Daley Center,
    Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

RENEE GOLDFARB,
CHRISTINE COOK,
Assistant State's Attorneys,
    Of Counsel.*

---

* **THERESA COPELAND**, a first year law student at University of New Mexico and a law clerk in the Criminal Appeals Division of the Cook County State's Attorney's Office, assisted in the research and preparation of this brief.

FILED
CRIMINAL APPEALS

JUL 1 5 2003

809 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE